IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America, ) Case No. 4:21-cr-01597-RM-LCK
)
           Plaintiff, )
)
vs. )
) Tucson, Arizona
Efren Alexis Rojo-German, ) October 3, 2022
) 9:58 a.m.
           Defendant. )
_____ )

Before the Honorable Rosemary Márquez

Evo A. DeConcini U.S. Courthouse
405 West Congress Street
Tucson, Arizona 85701

Transcript of Proceedings
Jury Trial Day 1

Proceedings reported and transcript prepared by:
   Andrea Tracy Jamieson, RDR, CRR

Proceedings reported by court reporter using steno machine shorthand; transcript prepared with court reporting hardware/software.

UNITED STATES DISTRICT COURT

A P P E A R A N C E S

For the Government:

 Office of the United States Attorney

 Angela W. Woolridge, AUSA

 405 West Congress Street, Suite 4800

 Tucson, Arizona  85701

 (520) 620-7300


For the Defendant:

 Law Office of Mark L. Williams

 Mark L. Williams, Esq.

 Post Office Box 4454

 Rio Rico, Arizona  85648

 (520) 287-4501

INDEX OF COURT PROCEEDINGS

PAGE

Jury Voir Dire......................................... 5

Batson Challenge ..................................... 60

Preliminary Jury Instructions Discussed ................ 69

Motion for Selection of Alternate Juror............... 72

Preliminary Jury Instructions........................ 74

Opening Statement by the Government.................... 86

Opening Statement by the Defendant.................... 94

Motions in Limine.................................... 172

Discussion whether defendant will testify............. 177

INDEX OF EXAMINATIONS

WITNESSES:                                            PAGE

**CREIGHTON BRANDT**

Direct Examination By Ms. Woolridge.................. 101

Cross-Examination By Mr. Williams.................... 129

Redirect Examination By Ms. Woolridge................ 138

**PATRICK MURRAY**

Direct Examination By Ms. Woolridge.................. 141

INDEX OF EXHIBITS

| Exhibit No. | | ID | REC'D |
|---|---|---|---|
| 8 | .................................. | 110 | 111 |
| 9 | .................................. | 167 | 169 |

(On the record at 9:58 a.m., as follows:)

THE CLERK:  CR21-1597, United States versus Efren Alexis Rojo-German, on for Jury Trial Day 1.

Counsel, state your appearances, please.

MS. WOOLRIDGE:  Good morning, Your Honor.

Angela Woolridge appearing on behalf of the United States.

THE COURT:  Good morning.

MR. WILLIAMS:  Good morning, Your Honor.

Mark Williams for Efren Alexis Rojo-German.  He is present to my left, being assisted by a Spanish interpreter.

THE COURT:  Good morning, Counsel.

This is the time set for a jury trial.  Are the parties ready to proceed?

MS. WOOLRIDGE:  Yes, Your Honor.

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Thank you.  Please be seated.

Good morning, ladies and gentlemen.  The record will reflect prospective jurors are seated in the courtroom.  There are 31 on this side of the bar.  I am going to ask you all to stand -- everyone to stand, and be sworn.

(Prospective jurors duly sworn.)

THE COURT:  Ladies and gentlemen, you will now be asked a number of questions of yourselves.  They are not designed to pry unnecessarily into your personal lives.  These

questions are necessary for the jurors and for the Court to find out whether you can put aside preconceived notions, whether you can put aside any biases that you may have, and be an impartial juror, and be an impartial and fair juror, to both parties.

If at any time you would prefer to approach the bench to answer the question in private, just raise your hand, let us know, and we can do so.  We can -- you can answer your question away from everybody else's hearing.

Those jurors whose names have not -- whose numbers, excuse me, have not been called, those of you seated on the other side of the bench, listen closely to the questions, as some of you may be substituted as panel -- on the panel as jurors are excused; however, you need not raise your hand if your answer to a question is "yes."  Just remember your answer, and when I call you to replace the juror, I'll ask you if you would have answered "yes" to any of my questions.

Those of you who are seated on this side of the bench, if an answer to a question is "yes," I'll ask you to raise your hand and wait for the microphone that Denise has, and she'll give you the microphone so that you can answer the question into the microphone.

Before we go any further, let me introduce myself.

My name is Rosemary Márquez, I am the district court judge that will be presiding over this case.

Directly in front of me, to my right hand, is Sandy Fuller. She is the deputy clerk and she will be -- she does pretty much everything. She handles the evidence, the paperwork. She's going to be the one you are going to have contact with. If you need anything, she's going to be the only person you'll be contacting.

In front of me is Tracy Jamieson, she is our court reporter. She takes down everything we say, but she can only hear it if it's spoken into a microphone. So you need to make sure that when you speak, you are speaking into a microphone. Everything we say in the courtroom comes up on my screen, so if you see me looking at my screen it's because I'm reading what she is saying. It's like closed captioning, when you get used to it and you are watching it on TV, you can't hear anymore, you just have to read. And so that's what she's doing.

Denise is my judicial assistant, and she'll be helping us this morning by providing the microphone for you to speak into.

The government is represented by Angela Woolridge.

Ms. Woolridge, will you introduce yourself and the people seated at you -- the person seated at your table.

MS. WOOLRIDGE: Thank you, Judge.

Good morning, ladies and gentlemen. My name is Angela Woolridge, I am an Assistant United States Attorney here representing the United States in this case. And with me at this table is Special Agent Bryan Del Villar. He's with the

Homeland -- Department of Homeland Security, Homeland Security Investigations.

THE COURT: Thank you. Please be seated.

Do any of you know Ms. Woolridge, or anyone from her office, or the agent with her?

Mr. Lacsamana, you are on our panel?

PROSPECTIVE JUROR 41: Yes, Your Honor. Good morning.

THE COURT: I thought you were here for court.

PROSPECTIVE JUROR 41: I am here to serve as a juror, Your Honor.

THE COURT: Thank you.

Mr. Lacsamana is an attorney in Tucson, and he regularly appears before this Court.

THE CLERK: Juror 41, Judge.

THE COURT: Juror 41. Thank you.

Sorry. I should have used your number.

Mr. Lacsamana, I know you know both parties -- could I see -- let me see Juror 41 at sidebar, and I'll see the counsel at sidebar as well.

And ladies and gentlemen, at certain times we are going to go to sidebar just to deal with things that we can do more efficiently, I guess, than doing this back and forth, so...

(At sidebar.)

THE COURT: Do you waive your client's presence for --

MR. WILLIAMS: Yes.

THE COURT: Okay. Thank you.

Juror -- Juror 41, Mr. Lacsamana, is there -- I know you -- because you've been practicing here for so long, I know you know the parties, you know the law, you know the jurors, you know the process.

Are you going to be able to put everything aside and be able to be fair and impartial to both parties?

Would anything about you serving in this case make it uncomfortable for you to serve?

We have -- we have a lot of jurors, so if for some reason you wanted to be excused, I would certainly have no objection to that. Unless the parties have an objection

PROSPECTIVE JUROR 41: If I may, Your Honor.

I don't have any problems with impartiality as to my acquaintance, professional or otherwise, of both counsel.

I can tell you my only hesitation has nothing to do with impartiality, it has to do with my calendar. You know, I have some things on my calendar that if I need to I can move, but if it's going to be longer than four days, I'm going to have a problem.

THE COURT: Okay. I don't think the trial will be longer than four days. But like I said, we have -- we have many jurors. We have extra jurors that we brought in.

So if serving at another time on a different case would be more convenient for you, I would have no objection to

that.

But let me hear from Ms. Woolridge.

MS. WOOLRIDGE:  I also would have no objection, understanding the difficulties of -- of balancing a lengthy calendar.  So that's certainly -- and given your interaction with the Court, myself, and Mr. Williams, if that's -- again, I defer to the Court, but I certainly don't have an objection.

MR. WILLIAMS:  Your Honor, I really think it's going to take about two days to do this trial.  I don't think we're going to get into a day 3 or a day 4.

I don't recall ever meeting this gentleman, but I think I've seen him in court, and I don't recall having any contact with him.  So, to me, he seems like a highly qualified juror and we would hate to lose him.  So that being said, I would hope he can stay around just to participate in the process.

THE COURT:  Do you have court today and tomorrow?

PROSPECTIVE JUROR 41:  I have a 1:00 o'clock VTC that I'm sure I can, you know, move to another time, because this is an unforeseen circumstance.

And I don't remember what else I have in the afternoon, but I know I have a 1:00 o'clock VTC with Mr. Abe Hernandez from another case.  That would be the only thing I would need to move for today.

I have to look at my calendar for tomorrow and

Wednesday, but, you know, with enough advance notice, you know, pretty much everybody has been very accommodating.

Like I had a 9:45 change of plea with Judge Ferraro, and he did it at 9:15 so I could be here, you know, in time for the 9:30.

So, honestly, Your Honor, I'd like to try and stay. You know, if I make it through the process, I'll make it through. If I don't, I don't. But I would like to try and see if I should serve on a jury.

THE COURT: Sure. Absolutely.

PROSPECTIVE JUROR 41: Thank you, Judge.

(Open court.)

THE COURT: And, Mr. Williams, please introduce yourself and introduce your client.

MR. WILLIAMS: Good morning, ladies and gentlemen. My name is Mark Williams. I'm an attorney from Nogales, Arizona. This is my client, Efren Alexis Rojo-German.

THE COURT: Do any of you know Mr. Williams or Mr. Rojo-German? Or anyone from his office?

Thank you. I see no hands.

Do any of you know each other?

Okay. This is a first.

Thank you. I see no hands.

I am going to read you a summary of the case. Please listen closely. Or a summary of the charges. Please listen

closely.  I will ask you if you know anything about the case or if the subject matter of the case would make it difficult for you to serve.

The defendant is charged in the indictment with smuggling goods from the United States.  In order for the defendant to be found guilty of this charge, the government must prove the following elements beyond a reasonable doubt:

First, the defendant knowingly or fraudulently attempted to export from the United States merchandise or received, concealed, bought, sold, or in any manner facilitated the transportation or sale of such merchandise prior to exportation, knowing the same to be intended for exportation.

Second, the exportation was contrary to United States law or regulation.

Third, the defendant did something that was a substantial step towards committing the crime, and that strongly corroborated the defendant's intent to commit the crime.

In the second count of the indictment, the defendant is charged with making false statements in the records of federal firearms licenses, in violation of United States Code.

The government alleges that the -- first, the seller of the firearm was a licensed firearms dealer.

Second, in connection with acquiring a firearm from the licensed firearms dealer, the defendant made a false statement.

And third, the defendant knew the statement was false.

And fourth, the false statement was material, that is the false statement had a natural tendency to influence the licensed firearms dealer into believing that the firearm could lawfully be sold to the defendant.

These are charges in the indictment. It is not evidence against an accused person.

The fact that a person has been indicted should create, and does not create -- excuse me -- would create no inference, and should not create an inference, or authorize an inference to be drawn against him merely because he was accused of an offense.

The defendant is presumed to be innocent of the charge contained in the indictment. The defendant has pleaded not guilty to the charge and is presumed innocent unless and until proved guilty beyond a reasonable doubt.

Furthermore, a defendant has a right to remain silent and never has to prove innocence or present any evidence.

I want to explain to you that the indictment in a criminal case is merely an accusation. It is the way that the law provides to accuse a person of an offense in order to bring that person to Court, but it is not evidence.

Have any of you seen or heard or read anything about this case?

Have any of you -- do any of you have any familiarity with anything similar to this case?

Juror Number 30?

PROSPECTIVE JUROR 30: Yes. My dad is a retired police officer with the Phoenix Police Department.

THE COURT: And do you talk to your dad about his cases?

PROSPECTIVE JUROR 30: I know little bits and pieces of past cases. You know, and we grew up in a gun family -- gun-friendly family as well. So, you know, some things like this are very familiar to me in terms of, you know, what he's done for a living. And he always wanted to be transparent with his family of what he did at work, if it was appropriate to share, as well as, you know, making us aware of what's going on in our community.

THE COURT: And anything about that information that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 30: I was always believed to -- raised to believe that what a police officer says, you know, or ask you to do, you should do. And I am a big believer in following the rules and following the laws, so I would say I am more inclined to believe the testimony of a law enforcement officer.

THE COURT: You are going to be instructed that you are to judge the testimony of all the witnesses under the same conditions and rules. In other words, you can't give -- you can't give more weight to the testimony of a law enforcement

officer merely because they are a law enforcement officer.

Would you be able to follow that instruction?

PROSPECTIVE JUROR 30:  Yes.  I would like to, to the best of my ability.

THE COURT:  Thank you.

Any follow-up, Ms. Woolridge?

MS. WOOLRIDGE:  No, Your Honor.  Thank you.

THE COURT:  Any follow-up, Mr. Williams?

MR. WILLIAMS:  Let's see if I can get this going.

Good morning.  It's anticipated that there's --

THE COURT:  I don't think it's working, Mr. Williams.

MR. WILLIAMS:  The light's on.

THE CLERK:  Put it more towards your mouth.

MR. WILLIAMS:  Okay.

Good morning.  In this case it's anticipated that there is going to be a couple of law enforcement officers testifying; one is from Homeland Security Investigations and another one from I think Alcohol, Tobacco and Firearms.

Given your family background and your experiences, you know, in dealing with your father who's in law enforcement, as you are hearing the testimony of the officers in this case, the law enforcement officers, they are law enforcement officers, do you believe that you would be able to set aside your leaning towards believing their testimony in this case?  Or would you -- are you just going to accept it as fact and not be able

to consider that maybe what they're saying is not accurate?

PROSPECTIVE JUROR 30:  I would like to do the best to my ability.  You know, it's really hard in today's day and age with a lot of the things that are going on.

You know, like I said, I would like to be as impartial as I can, but I was raised in a household where, you know, I've always grown up knowing that what an officer says is correct, and I like to believe that it's the truth.

THE COURT:  Thank you.

PROSPECTIVE JUROR 30:  That's the best answer I can give.

THE COURT:  Can I see counsel at sidebar?

(At sidebar.)

THE COURT:  Do you have a motion to make, Mr. Williams?

MR. WILLIAMS:  Yes, Your Honor.  I'd ask that she be excused for cause.

THE COURT:  Any objection?

MS. WOOLRIDGE:  Yes, Judge.  I do believe that she said that she could set her feelings aside and that she -- her statements were specific in the household she was raised in, but not with regard to this case.

THE COURT:  Juror Number 30 will be excused.

MR. WILLIAMS:  Thank you, Your Honor.

(Open court.)

THE COURT:  Juror Number 30, you are excused.

Please call a replacement juror for Juror Number 30.

PROSPECTIVE JUROR 41:  Your Honor, if I may.  With respect to the answer to your last question, I would --

THE COURT:  Mr. Lacsamana, we're going to -- are you trying to answer the last question?

PROSPECTIVE JUROR 41:  Yes, I am, Your Honor.

THE COURT:  So hold on.

PROSPECTIVE JUROR 41:  And I would request a sidebar.

Oh, I need a microphone.

Your Honor, in regards to answering your last question, I would respectfully request a sidebar to answer it.

THE COURT:  Well, so I'm only asking the jurors that are seated on this side of the bar.

PROSPECTIVE JUROR 41:  Right.

THE COURT:  If your answer is yes to any of my questions, you just need to -- you just need to remember that answer, and if I ask you to replace one of the jurors then I'll ask you at that time.

PROSPECTIVE JUROR 41:  Thank you, Judge.  I'm just trying to be candid with the Court.  I have an obligation --

THE COURT:  I understand.  But I'll ask you at that time if --

PROSPECTIVE JUROR 41:  Thanks, Judge.  I've never been a juror before.

THE COURT:  Thank you.

THE CLERK:  Juror Number 32.

THE COURT:  Please come forward, Juror Number 32.

THE CLERK:  And would you sit in seat number 30, which is right up here.

THE COURT:  Juror 32, would you have answered yes to any of my questions so far?

PROSPECTIVE JUROR 32:  No.

THE COURT:  Thank you.

Would anything about this case, and I think I've asked this, make it difficult for to you serve as a juror,

Juror Number 2.  Wait for the microphone.

PROSPECTIVE JUROR 2:  Good morning.

THE COURT:  Good morning, Juror Number 2.

PROSPECTIVE JUROR 2:  I don't know if it would make it difficult for me, but I just wanted to reveal that my entire adult life I've been in emergency services as a paramedic, as a SWAT officer.  I've worked a lot with Homeland Security and emergency management.  So I just wanted to --

THE COURT:  And would your work and employment make it difficult for you to be fair and impartial to the defense in this case?

PROSPECTIVE JUROR 2:  I don't believe so, but I was also a federal firearms dealer.

THE COURT:  Okay.  And would your work affect your

ability to be fair and impartial to both sides in this case?

PROSPECTIVE JUROR 2:  I don't -- I don't believe so.

THE COURT:  And certainly we don't -- thank you for sharing that.

Certainly we don't want you to put all of your experiences aside when listening to the testimony in this case, but we want you to start with an open mind to both sides and make your decision based on the law as I give it to you.

Would you be able to do that impartially?

PROSPECTIVE JUROR 2:  I believe so.

THE COURT:  Thank you.

Have any of you, or members of your close family, ever been involved in a case like this?

The defendant is Hispanic.  Is there anything about this that would in any way prevent you from being fair and impartial?

I see no hands.

He is using our Court certified interpreter.  Would anything about that affect your ability to be fair and impartial in this case?

I see no hands.

Have any of you ever served as -- or been a member of a grand jury, in the federal or state level?

And if you have served, you'll know.

I see no hands.

Have any of you ever been a witness in a civil or a criminal case?

Ever served as a witness?

Juror Number 7.

PROSPECTIVE JUROR 7:  I was called as a witness.

I'm a certified sign language interpreter, and I served as a witness against a child abuse case where a stepfather had abused the son and he -- yeah.

THE COURT:  How long ago was that?

PROSPECTIVE JUROR 7:  20 years ago or so.

THE COURT:  Anything about that experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 7:  No.

THE COURT:  Were you -- were you treated fairly by the lawyers?

PROSPECTIVE JUROR 7:  Yes.

THE COURT:  Thank you.

Any follow-up, Ms. Woolridge?

MS. WOOLRIDGE:  No, Your Honor.  I don't believe so.

Thank you.

THE COURT:  Any follow-up, Mr. Williams?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Anyone -- oh, Juror Number 4.

PROSPECTIVE JUROR 4:  I was a witness for a bank fraud.  It's been so long ago, I can barely remember it.  Must

be 30 years ago.

THE COURT: And were you a victim in the case, or...

PROSPECTIVE JUROR 4: No, Your Honor.

THE COURT: Okay. Anything about that experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 4: No. I just thought I better answer.

THE COURT: Okay. Were you treated fairly by the lawyers and the Court?

PROSPECTIVE JUROR 4: Yes.

THE COURT: Thank you.

Anyone else?

Juror Number 3.

PROSPECTIVE JUROR 3: I previously worked for Child Protective Services and was often a witness against those abuse cases where those were taken to trial.

THE COURT: Anything about that experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 3: No. I don't believe so, Your Honor.

THE COURT: And were you treated fairly by the courts and the lawyers?

PROSPECTIVE JUROR 3: I believe so, yes.

THE COURT: Thank you.

Anyone else?

Has anyone been a victim in a case?

Juror Number 27.

And you can certainly come to sidebar, if you prefer.

PROSPECTIVE JUROR 27:  I was a victim of attempted kidnapping.

THE COURT:  And how long ago was that?

PROSPECTIVE JUROR 27:  Let me see.  '97, I believe.

THE COURT:  And were you -- do you feel you were treated fairly by the lawyers, the defense lawyer?

PROSPECTIVE JUROR 27:  Oh.  Yeah.  Absolutely.

THE COURT:  And treated fairly by the prosecution?

PROSPECTIVE JUROR 27:  (Nodding head.)

THE COURT:  And did your case go to trial?

PROSPECTIVE JUROR 27:  We settled.

THE COURT:  Okay.  And was that -- anything about that experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 27:  No, not at all.

THE COURT:  Thank you.

Anyone else?

Juror number?

PROSPECTIVE JUROR 23:  23.

THE COURT:  23.

PROSPECTIVE JUROR 23:  I'm a former Tucson Police

Officer for 13 years.  I was a victim on numerous occasions of assault.  Also testified numerous times in both criminal and civil cases.

THE COURT:  And anything about your employment that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 23:  No, Your Honor.

THE COURT:  Thank you.

And do we have other -- is there anyone else -- let me ask: Who has worked in law enforcement or has a close family member who is in law enforcement?

Let's start over here, Denise, so we can start with the numbers.

PROSPECTIVE JUROR 1:  Yes.  My brother was a police officer for over 30 years.  My son was with the Department of Corrections.  And I think that's it.

THE COURT:  Anything about their employment that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 1:  No.

THE COURT:  Thank you.

PROSPECTIVE JUROR 3:  My father worked for Immigration as an inspector on the border.

THE COURT:  And you are Juror Number 3?

PROSPECTIVE JUROR 3:  3.

THE COURT:  Anything about your father's employment

that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 3:  I don't believe so, Your Honor.

THE COURT:  Thank you.

Juror Number 6.

PROSPECTIVE JUROR 6:  I worked for Customs and Border prior to my current job.

THE COURT:  And how long were you with Customs and Border?

PROSPECTIVE JUROR 6:  Two years.

THE COURT:  Anything about that employment that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 6:  No.

THE COURT:  Thank you.

Anyone else?  Juror number -- anyone here in the front row?

Hold on.

Anyone here?  Okay.

Sir, watch your head.  There's a prompter up there.

PROSPECTIVE JUROR 17:  I volunteer for an organization that works with retired and currently working K9s.  So I --

THE COURT:  You work for --

PROSPECTIVE JUROR 17:  -- family member but --

THE COURT:  You work for an organization that --

PROSPECTIVE JUROR 17:  We raise money for retired K9s

and current working dogs.

THE COURT:  Okay.  And anything about that that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 17:  (Shaking head.)

THE COURT:  Thank you.

Is that a no, sir?

PROSPECTIVE JUROR 17:  No.

THE COURT:  Thank you.

Juror Number 22?

PROSPECTIVE JUROR 22:  Yes.  My husband is retired law enforcement.  He worked with the State of Arizona Department of Agriculture as a livestock officer.

THE COURT:  Okay.  Anything about his employment that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 22:  No.  I don't think so.

THE COURT:  Juror 26.

PROSPECTIVE JUROR 26:  Good morning, Your Honor.  I have two brothers that currently serve as Border Patrol agents; one is stationed in the port of entry in Nogales, the other in Douglas.  They've been doing that job for over 20 years.

THE COURT:  And anything about their employment that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 26:  I don't believe so.

THE COURT:  Thank you.

And anyone else in the front row?

PROSPECTIVE JUROR 27:  My husband is a dispatcher for the sheriff's department.

THE COURT:  And Juror 27, anything about his employment that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR 27:  No.  Not at all.

THE COURT:  Thank you.

Ladies and gentlemen, is there anyone who could not judge the testimony of all the witnesses by the same standard?

For example, is there anyone who would give more or less weight to the testimony of a law enforcement officer than to the testimony of any other witness just because the witness was law enforcement?

I see no hands.

Has anyone practiced law or does anyone -- I am just talking to people on this side of the bar.

Is there anyone who has practiced law or has a law degree or has studied criminal justice?  Or have been a paralegal?

Juror Number 29?

PROSPECTIVE JUROR 29:  I was a litigation manager for a debt collection law firm, as well as a paralegal there.

THE COURT:  So anything about that employment that would affect your ability to be fair and impartial in this

case.

PROSPECTIVE JUROR 29:  No.

THE COURT:  Thank you.

Does anyone have any close family members or close friends who are lawyers or who have practiced law?

Okay.  Let's start over here so we can go in order.

Juror number -- anyone in the back row?

Front row?

Juror Number 10.

PROSPECTIVE JUROR 10:  I worked for an estate planning attorney for 14 years.  One of the -- in one of the firms that we worked in, we covered quite a few different things, litigation and everything.  But I didn't have a lot to do with any of those, just the estate planning.

THE COURT:  Okay.  Thank you.

Anything about that employment that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR 10:  No.

THE COURT:  Thank you.

Anyone in that back row?

Juror 17.

Watch your head.

PROSPECTIVE JUROR 17:  We've got friends that are lawyers.  My wife is an office administrator for a law firm downtown.

THE COURT:  And do you talk to your friends about their cases?

PROSPECTIVE JUROR 17:  No.  It's usually just IP and commercial real estate, so...

THE COURT:  Thank you.

Anyone else in the back row?

Juror Number 27?

PROSPECTIVE JUROR 29:  29.

THE COURT:  29.  Excuse me.

PROSPECTIVE JUROR 29:  My brother-in-law is a debt collection lawyer.

THE COURT:  And do you talk to him about his cases?

PROSPECTIVE JUROR 29:  We worked together.  He was my boss.  But other than that, no.

THE COURT:  Anything about the employment that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR 29:  No.

THE COURT:  Thank you.

So, ladies and gentlemen, it's going to be your job to determine what the facts are in this case, and it's going to be my job to give you the law that applies.

Is there anyone here that would not be able to follow my directions, even if you think that the law is different or that the law should be different?  Or for you who are paralegals or know about the law, you might think that I am wrong or that the

law is different?

Is there anyone who would not be able to follow the law as I give it to you, even if you think the law is wrong?

Juror Number 19, you seem confused.  Do you have a question?

PROSPECTIVE JUROR 19:  No.

THE COURT:  Do I need to rephrase my question?

PROSPECTIVE JUROR 19:  No.  No.  You are fine.

THE COURT:  Okay.  It's kind of a convoluted question, but I think what I am saying is:  It's going to be your job to find what the facts are and to apply those facts to the law as I give it to you.

Is there anyone who would not be able to follow that directive?

Does anyone have a PACER account -- and I'm talking about the people on this side of the bar -- for employment purposes or just because you like to log on to PACER accounts?

If you have one, you know what it is.

Okay.  I see no hands.

The law requires the government to prove the defendant guilty beyond a reasonable doubt.  The defendant is presumed by law to be innocent, which means the defendant is not required to prove his innocence and the defendant is not required to present any evidence.  The defendant is not required to testify.  And you are going to be instructed that if he doesn't

testify, you can't use that against him in any way.

Does anyone disagree with these very important principles of law?

And I am going to instruct you that you are to follow these very important principles of law.

Is there anyone here who would not be able to follow these principles?

Ladies and gentlemen, we recognize that jury service is probably one of the -- is probably an inconvenience for you, to say the least. You have to take time out of your busy days and take from your families and your employment.

We are predicting that this case will, at the most, go into Thursday. We would not have court on Wednesday.

Is that correct, Ms. Woolridge? All day Wednesday?

MS. WOOLRIDGE: Correct, Your Honor.

THE COURT: We would not have court all day Wednesday, so we would resume on Thursday. So we'd -- you'd be participating all day today, all day tomorrow, and Thursday.

We would start at 9:30 -- I apologize, we had a few delays this morning. But we'll start at 9:30 every morning, and we'll take a mid-morning break. We'll take a noon recess, for lunch, about an hour, hour and a half. Actually, an hour and a half. And then we'd end at close to 5:00 o'clock.

Is there anyone who would not be able to participate or serve as a juror because of this schedule?

Okay.  We'll get back to you.

The people in the back?

Anyone in the front?

Thank you.  I see no hands.

If at any point you need to take a break or use the restroom, just raise your hand and we can take a recess for that.  Or if you need to stand -- if you are sitting on these hard benches and you need to stand, just feel free to do so.

Is there anyone who is a member of a group that's specifically organized for the enforcement of laws?  Certain laws, such as MADD or SADD, or the Border Patrol Minutemen?  Anything like that?

Let's start with -- and let's start with Juror 17.  I see that there's a hand.

PROSPECTIVE JUROR 17:  I am a member of the Gun Owners of America.

THE COURT:  Okay.  And anything about that membership that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 17:  No, ma'am.

THE COURT:  Okay.  Thank you.

Let me just throw in, in this case, anyone who is also a member of the NRA.  Let me see...

Okay.  Let's start over here, Denise, with Juror Number 2.

Anything about your membership that would affect your

ability to be fair and impartial in this case?

PROSPECTIVE JUROR 2: No.

THE COURT: Thank you.

Juror Number 11?

PROSPECTIVE JUROR 11: I've got memberships with the NRA, the USCCA, United States Concealed Carry Association, and I've also got a membership with Front Sight Firearms Training.

THE COURT: With -- what was the last one?

PROSPECTIVE JUROR 11: Front Sight Firearms Training in Nevada.

THE COURT: Front Side?

PROSPECTIVE JUROR 11: Front Sight.

THE COURT: Thank you.

Anything about those memberships and your participation in those organizations that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 11: No.

THE COURT: Thank you.

All right. Juror number?

PROSPECTIVE JUROR 22: 22.

THE COURT: 22. Thank you.

PROSPECTIVE JUROR 22: I'm an NRA member, and I also -- my husband bought me a membership for the Front Sight years ago, and it -- the Minutemen is a disbanded organization that they don't do that anymore, but I was a member of the

Minutemen when they were running.  But it's been gone for 15 years.

THE COURT:  Okay.  And anything about those memberships that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 22:  No.  I don't think so.

THE COURT:  Thank you.

Anyone else in the back?

A show of hands:  Who owns a firearm?

And keep your hands up so that the lawyers can...

Thank you.

Any follow-up on any of the questions or any other questions you would like to ask, Ms. Woolridge?

MS. WOOLRIDGE:  Not at this time, Your Honor.

Thank you.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Not at this time, Your Honor.

THE COURT:  Thank you.

Have any of you ever -- and you can approach the bench for this question -- ever been convicted of a minor offense, or a crime, or arrested -- not arrested, but convicted of a minor offense?

And for this case, a DUI would not be a minor offense.

Anyone that has a conviction for a misdemeanor or a DUI?

Or anyone that has a close family member or close friend that has had to deal with a legal conviction?

Let's start with Juror Number 1.

PROSPECTIVE JUROR 1:  Um, yes, I have two sons.  One for -- was convicted for the DUI, and another one was convicted for -- I don't remember.  I'm sorry.

THE COURT:  That's okay.

PROSPECTIVE JUROR 1:  It was some involvement with the police and stuff, so...

THE COURT:  Did you have to go to court with them?

PROSPECTIVE JUROR 1:  Um, no.  They were adults.

THE COURT:  Okay.  Were you involved in any of their cases in any way?

PROSPECTIVE JUROR 1:  Um, no.  Not really.

THE COURT:  Anything about their experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 1:  No.

THE COURT:  Thank you.

Anyone else in the back row?

Okay.  Juror Number 12.

PROSPECTIVE JUROR 12:  My wife's daughter had a DUI maybe 15, 20 years ago, and I had really no involvement in it.  She spent some time in prison.  Well, jail.  Six months, maybe.

THE COURT:  Anything about that that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 12:  No.

THE COURT:  Thank you.

PROSPECTIVE JUROR 14:  14.

My son was convicted with a -- for a DUI.

THE COURT:  And did you have any involvement in his court hearings?

PROSPECTIVE JUROR 14:  No, ma'am.

THE COURT:  Anything about his experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR:  No, ma'am.

THE COURT:  Thank you.

PROSPECTIVE JUROR 17:  I have a sister-in-law that spent some time in the state hospital for assault with a deadly weapon.

THE COURT:  And were you involved in any of the proceedings?

PROSPECTIVE JUROR 17:  No.

THE COURT:  Anything about that experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 17:  No.

THE COURT:  Thank you.

Juror Number 24.

PROSPECTIVE JUROR 24:  Yes.  My sister was convicted of DUI.

THE COURT:  Were you involved in her case at all?

PROSPECTIVE JUROR 24: No, ma'am.

THE COURT: Anything about that -- of her experience that would affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR 24: No, Your Honor.

THE COURT: Thank you.

Juror Number 32.

PROSPECTIVE JUROR 32: My brother was convicted of assault with a deadly weapon. I was not involved in his case.

THE COURT: Okay. And you didn't -- did you go to court with him?

PROSPECTIVE JUROR 32: No.

THE COURT: Anything about his experience that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR 32: No.

THE COURT: Thank you.

Ladies and gentlemen, I am going to read you a list of some people, and I'm going to ask you -- or I am going to read you the names of some people who might be witnesses. They may or may not be called to testify in this case.

Please listen carefully, and if you think you know or might know who they are, I am going to ask you -- I'm going to ask you if you think you know them or you might know who they are.

Homeland Security Agent Bryan Del Villar, Homeland Security Agent Tony Tran, ATF Agent Creighton Brandt, and Patrick

Murray.

Do any of you know or think you know those people?  Any of those people.

I see no hands.

Ladies and gentlemen, you have some questionnaires in front of you -- have a questionnaire in front of you.  I am going to ask you to stand, give us your juror number and answer the question on the questionnaire.

Let's start with Juror Number 1.

PROSPECTIVE JUROR 1:  Juror Number 1.

Place of birth is Laredo, Texas.

I've lived in Arizona 65 years.

I presently live in Tucson, around the airport area on the south side.

High school diploma for my educational background.

I'm not employed.  I am retired.  Former jobs I've held has basically all been in medical field, from a consultant to a manager to -- but it's all been medical work.

I am married.  My husband is also disabled.  I have three sons, ranging from the age of 38 to 45.  And, no, they do not live with -- well, I take that back.  We live with my youngest son.  He don't live with me; we live with him.

THE COURT:  Thank you.

PROSPECTIVE JUROR 1:  I don't belong to any organizations or clubs.  I have no bumper stickers on my

vehicle.

And, yes, I sat for jury duty once and it was a hung jury.

THE COURT: Were you the foreperson?

PROSPECTIVE JUROR 1: Was I -- no. No.

THE COURT: What type of case it was?

PROSPECTIVE JUROR 1: It was -- it was a DUI case, but it was a weird one. I guess he was parked in some Circle K and had the keys in the ignition, and was -- had been drinking, that kind of case.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR 2: Good morning.

THE COURT: Good morning.

PROSPECTIVE JUROR 2l: Juror Number 2.

I was born in Muncie, Indiana. M-u-n-c-i-e.

I've lived in Arizona for three years, and I have wintered here for about eight.

I presently live just outside the city limits, over on the southwest side of Tucson.

High school graduate. Little bit of college when I was going through paramedic school for anatomy and physiology.

I am not -- I am retired from county government. I was a paramedic for 30 years. I was an administrator for 25 years, and over saw 9-1-1, EMS, EMA, fire for a few years, and then also was a SWAT officer as a paramedic.

I am married.  My wife is a retired emergency room nurse, surgical nurse.  We do not have any children.  I don't have any children.

I'm a member of the Tucson Trap and Skeet Club here in Tucson.  I don't have any bumper stickers.

And I did sit as a juror on a shooting, firearms case, several years ago.

THE COURT:  Was that in state court?

PROSPECTIVE JUROR 2:  It was in city court for the City of Muncie.

THE COURT:  And were you the foreperson?

PROSPECTIVE JUROR 2:  You mean one of the main jurors?

THE COURT:  Yes.

PROSPECTIVE JUROR 2:  Yes.

THE COURT:  What was the verdict?

PROSPECTIVE JUROR 2:  Guilty.

THE COURT:  Thank you.

PROSPECTIVE JUROR 3:  Juror Number 3.

I was born in Salt Lake City, Utah.

I've lived in Arizona since '91.  1991, minus a couple of years.  And then came back.

Presently live in Safford, Arizona, which is in the Gila Valley in the eastern part of the state.

I have a master's degree in social work.

I currently work for the town of Thatcher.  I manage the

wastewater treatment plant and oversee other -- just any other thing they need me to do. It's a small town; we do a lot of different things.

I've worked in the Child Protective Services field before; mental health agency before that.

I am currently married. Divorced, also. My wife works out of the home doing T-shirts. She's also done -- ran her own business, a roofing business with her former spouse. Basically like clerical type work is what she's done in the past.

I have six children, four stepchildren. Their ages range from 9 to 22. The -- let's see, four -- two of my kids and two of my step kids are not in the home, so the others are. And then come -- go in and out with their other parents also, though.

No specific clubs or organizations. No bumper stickers.

I've been on a juror (sic) before in Pinal County. It was a burglary case and found guilty. I was one of the main jurors on that -- no. Innocent. Sorry.

THE COURT: And you were a juror but you weren't the foreperson. The person that signs the verdict form?

PROSPECTIVE JUROR 3: No.

THE COURT: And did you say that was not guilty?

PROSPECTIVE JUROR 3: Correct.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR 4: Juror Number 4.

I was born in Saint Louis.

I've been in Arizona for five years. I currently live in Oro Valley.

I have about three years of college.

I am employed with California Closets, and a service coordinator for them. Former jobs, manager for an entertainment venue, and I was a realtor for many years in New Mexico.

I am currently unmarried. I have no children.

I do not belong to any clubs or organizations. No bumper stickers.

I was a juror -- ended up being an alternate juror for a murder case.

THE COURT: Was that here in federal court or state court?

PROSPECTIVE JUROR 4: It was in new Mexico.

THE COURT: Thank you.

PROSPECTIVE JUROR 5: Hello. I'm Juror Number 5.

I was born in Michigan.

I've lived in Arizona for 7 years.

I am currently living in Rancho Sahuarita.

Educational background, I have an associate's degree in psychology, and I am currently attending school at Denver University.

I am currently employed as an area operations manager

at Target.  I manage about 147 associates.  Previous to that, I worked for UPS for six years as a manager and HomeGoods for three years as a manager.

Marital status is single.  I have three children, ages 2, 4 and 11.

I am not a part of any clubs.  I do not have any bumper stickers.

And I have never sat on a jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR 6:  Number 6.

Born in Miami, Florida.

I have lived in Arizona for five years.  I live in Sierra Vista.

And I have an associate's degree in IT security.  I am employed with the Department of Defense, Fort Huachuca, and what I do is I work on computers.

I -- my previous job was with Homeland Security, computers, and prior to that contractor for the DOD.

I am married.  I have two kids.  I -- my wife works at a salon.  And my -- I'm jumping around a little bit.  My ages -- the ages of my children are 13 and 17.

I actually -- the club I am with is the Sierra Vista Community Band.  I play with them.  And I have no bumper stickers.

And I have never been on a jury before.

THE COURT:  Thank you.

PROSPECTIVE JUROR 7:  Juror Number 7.

I was born in Idaho Falls, Idaho.

I've lived in Arizona for the past 38 years.  I live in Tucson, out at Rita Ranch.

I have a master's degree in rehab; education.  I am retired.  I worked for Tucson Unified for 25 years as a special ed tester, to qualify kids for services, and a freelance sign language interpreter at the University of Arizona and agencies in town.

I am married.  My wife is semi-retired.  She works for the University of Arizona as a student-teacher evaluator for the Department of Education.

We have three children.  Their ages are 42, 40, and 38. Two of them live here in Tucson, one lives in Washington, Seattle.

I don't belong to any clubs.  I have no bumper stickers.

And I've never sat as a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 8:  Juror Number 8.

Born in Nogales, Arizona.  Lived in Arizona for 56 years. Currently live in Hereford, Arizona, outside of Sierra Vista.

I have about 15 years of education, no degree.

I am currently employed with Schwan's Home Service.  I am a route sales representative.  Prior to that, I ran childcare

centers for 15 years.  And prior to that, I worked for Terminix.

I am married.  My wife is in medical administration.  I have two adult children.  My son, 34.  My daughter is 29, and she and her family live with us.

No clubs, no organizations, no bumper stickers.

And I've never been on a jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR 9:  Good morning, Your Honor.  I am Juror Number 9.

My place of birth was Tucson, Arizona.  I've lived here all my life.  I live -- currently live in south Tucson, near the airport, around that area.

My educational background is a high school diploma, some college, and I recently got my data analytic certification.

I am employed.  I am employed by Amazon.  What I do there is either pack, move product around; depends on where they need me.  I can do a lot of things there.

Some jobs I've briefly held were at the airport; two different jobs.  One was I'd assist elderly or disabled people in and out of the plane, and another one was a ticket agent for United Airlines.

I am not married.  I have no children.  I don't belong to any clubs or organizations.  I don't have any bumper stickers in my car.

And this is my first time as a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 10:  Juror Number 10.

I was born in Hartford, New York.  I've lived in Arizona for about 50 years.

I live in Tucson.  I live at Central.

I have a high school diploma and some college.

I am a realtor.  Prior to that, I worked for an estate planning attorney, and various jobs in car dealerships.

I am married.  I have -- my husband is a general manager of a large parts company in town.  I have three children.  They are 34 and 30.

I do not belong to any clubs or organizations.  My front license plate says "Move Over," and my back bumper says "Back Off."

And I do not have prior experience as a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 11:  Good morning.  I'm Juror Number 11.

I was born in South Bend, Indiana.  I've lived in Arizona since '91, and the whole time on the east side of Tucson.

I have a two-year associate degree from a tech school. I am presently employed with BRAKEmax Tire and Auto Service. I've been in the automotive field since I graduated tech

school, and had three years active duty in the Army before that.

I am currently married. My wife has worked in retail her whole life. We have got three children; they are 26, 23, and 19. And the youngest does still live with us.

As I said, I have memberships in the NRA, the United States Concealed Carry Association, and with the Front Sight Firearms Training. I do not have any bumper stickers.

I was on a juror (sic) one time for Pima County. I was not the foreman. It was a carjacking case, and it was a hung jury.

THE COURT: Thank you.

Was that in Tucson?

PROSPECTIVE JUROR 11: Yeah, that was in Tucson. Here in Pima County.

THE COURT: Thank you.

PROSPECTIVE JUROR 12: Good morning, Number 12.

I was born in Jersey. I've lived in Tucson for 50 years. I live on northwest Tucson.

High school education.

Employed; a field service technician. I've been in-house and field for many years. I don't even remember, 30, 25.

I am no longer married. I don't have any children.

No clubs or organizations. No bumper stickers.

And I have never been on a jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR 13:  I'm Juror 13.  Number 13.

I was born in Pennsylvania.  I've lived in Arizona for four years 45 years ago.  And five years currently, in midtown Tucson.

I have a high school diploma and a few years of college.  I am not employed right now.  I'm a housekeeper.  Let's see.  I was a seamstress.  I was in the secretarial field.  I was a bookstore shipping manager.  Church administrator.

I am married.  My husband was a research scientist for 30 years and is now a statistician.  I have a daughter, 45; son, 44.  They don't live with me.

I belong to a church in town.  I have a Tucson Botanical Gardens sticker.

I was on a jury 45 years ago, medical malpractice.  I don't remember the verdict.

THE COURT:  Was that here in Arizona?

PROSPECTIVE JUROR 13:  No, that was in North Carolina.

THE COURT:  Thank you.

PROSPECTIVE JUROR 14:  Juror Number 14.

TMC, here in Tucson, born.  A native.  Presently living in the northwest side of Tucson.

Education is a BS in mechanical engineering.

I am currently employed at FLSmidth, which makes mining

equipment.  I've been in mining related tasks for most of my career, other than working at Raytheon for a while.

I've married.  Three kids; ages 32, 26, and 24.

My wife is employed at Amphi School District as an office administrator at the main office.

Clubs, I'm a Classic Chevy Club member here in Tucson. Bumper stickers, Pittsburgh Steelers.

I sat on a jury.  It was state; it was an injury case.  And actually, I was an alternate, no the -- a primary.  They settled out of court.

THE COURT:  Thank you.

PROSPECTIVE JUROR 15:  I am Juror Number 15.

I was born in Minneapolis.  I've lived here about 50 years in Tucson.  And I live in central Tucson by the U of A.

I have a bachelor's in agriculture with some graduate work.

I've been employed as a horticulturist since I graduated from college.

I am married.  My husband is retired.  I have one child who is 37, who does not live with me.

I am a member of a women's leadership group.  And I'm in a book club; I don't know if that counts.  And I have a Tohono Chul bumper sticker and a Wolves soccer team from England sticker.

And I've been on two juries.  The first one was quite a while ago.  It was -- the defendant was in an altercation with

a police officer, and we found him guilty.  And the second one was a molesting charge with a child, and we found him guilty.

THE COURT:  Were you the foreperson in any of those cases?

PROSPECTIVE JUROR 15:  No, Your Honor.

THE COURT:  Thank you.

PROSPECTIVE JUROR 16:  Good morning.  I'm Juror Number 16.

Born and raised in Phoenix, Arizona.  I've lived in Arizona for 35 years.  I currently live in Tucson in the northeast side of town.

I have got education degrees from both the University of Arizona and Arizona State University in communications and business.

I am presently employed with a local retirement home here in town.  I am a caretaker and also I make sure they get their meals daily.

I am a U.S. Army Veteran of 22 years, and a -- also a -- retired also, and also I served with the California Army National Guard for eight years.

I am married.  My wife is a nurse where I work at.  I have three children.  My son is 21, lives in California.  My daughters are 25 and 26, and live in Texas.

I am a member of the VFW and the American Legion.  No bumper stickers.  No car.

I have been a juror before.  I served as a foreman on a murder case, a gang murder case, in Los Angeles; Los Angeles County.  The defendant was found guilty.

THE COURT:  Thank you.  Watch your head, sir, number 17.

PROSPECTIVE JUROR 17:  Juror Number 17.

I was born in Reno, Nevada.  I have lived in Arizona for about 15 years.  I currently live in Marana.

I have an associate's degree.

I'm not currently employed.  I have worked in the construction industry, fabrication, and some retail sales.

Married.  My wife works as an office administrator for a law firm.  We have no children.

I belong to the GOA, and I volunteer for Arizona K9 Heros.  The only stickers on my vehicles are American flag stickers.

And I have never been on a jury.

THE COURT:  Thank you.

PROSPECTIVE JUROR 18:  Number 18.

I was born in Tucson.  I've lived in Arizona for 45 years.  Presently, I live in the northwest side.

I have a high school education.

I am retired.  My jobs were in hospitality as a chef and a bartender.

I am single.  I have one child, my son, he's 40 years old.  He does not live with me.

I do not belong to any clubs or organizations.  I have no bumper stickers.

And I have never been a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 19:  I'm Juror Number 19.

I was born in Boston, Massachusetts.  I've lived in Arizona about 14 years.  I currently live in Vail.

I hold an MBA in social policy and management, and I am presently employed.  I oversee an agency that provides group homes for folks with developmental disabilities, and that's pretty much what I've done for 25 years.

I am single and I have one child, she is 12, and she does live with me.

I don't have any clubs or organizations, bumper stickers.

And I have never been a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 20:  I am Juror Number 20.

I was born in Watertown, New York.  I've lived in Arizona for 25 years.  I live on the west side of Tucson.

I have had three years of college.

I am not employed.  I have previously been a UPS driver, an administrative assistant for a general contractor, and a shipping manager for an online retailer.

I am married.  My husband works for a construction equipment rental company.  I do not have any children.

I don't belong to any clubs. I have a bumper sticker that says "Be Kind."

And I have never been a juror.

THE COURT: Thank you.

PROSPECTIVE JUROR 21: I am Juror Number 21.

I was born in Detroit, Michigan. I've been in Arizona for five years. I live in the Marana area.

I am retired. I have a master's degree in education. I was a teacher for 39 years.

I am married. My husband is retired. A retired carpenter. I have two children, 33 and 31. They do not live with me.

I don't belong to any clubs. I don't have any bumper stickers.

And I have never been a juror or seated on a jury.

THE COURT: Thank you.

PROSPECTIVE JUROR 22: I am Juror 22.

I was born in Lake Charles, Louisiana. We moved to Tucson in 1966. I've been here off and on for 55 years. We -- I live on the southwest side of town, the Drexel. Just west of the Tucson mountains, outside of the city limits.

I have an associate's degree in environmental technology. I am retired in 2008. I worked for the City of Tucson Water Department at the Hayden-Udall Water Treatment Plant before that -- or I did that for like 25 years for the City.

I am married. My husband is also retired. He's retired law enforcement for the state. I don't have any children. He has a son that's 39.

Clubs and organizations, I'm a member of the Desert Harness Drivers Club. It's a horse -- horse and carriage club. I do have a membership to the NRA and the Arizona Citizen's Defense League. And I am a precinct committeeman for Legislative District 20. I don't have any bumper stickers on my car.

I have been on a jury twice. The first one was just a simple DUI, and he was found guilty. And I was not --

THE COURT: The foreperson?

PROSPECTIVE JUROR 22: That guy, yeah.

And the other one was a car crash outside of Why, Arizona, and I actually -- the trial went longer than it was supposed to, and the last day when they were deliberating, I couldn't be there. I was driving for the rodeo parade and so I couldn't -- I was in the parade, driving. Carriage driving. So they did it without me.

THE COURT: Okay. Thank you.

PROSPECTIVE JUROR 23: Juror Number 23.

Indianapolis, Indiana. I've lived in Arizona for 18 years. I presently live in Vail in the Rincon Valley area.

I have four years of college.

I am retired. I served over 20 years in the U.S. Army and retired. I spent 13 years with the Tucson Police Department as

a patrol officer.

Been married for 46 years.  My wife is currently a real estate agent.  I have two children, ages 43 and 40.

I am an NRA member.  No bumper stickers.

And never a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 24:  I am Juror Number 24.

I was born in the Netherlands.  I've lived in Arizona for eight years.  I live in Marana.

I have a bachelor's in business.

I am currently employed part-time doing estate planning, and I was -- I worked for the Army and Air Force Exchange Service for about 20 years, and I was also a government contractor.

I am married.  My husband's retired also from the Army and Air Force Exchange Service.  I don't have any children.

Don't belong to any clubs.  Don't have any bumper stickers.

And I have been a juror in Dallas County for an assault case, and I was not the foreperson.

THE COURT:  Thank you.

PROSPECTIVE JUROR 25:  Juror 25.

I was born in Belgium.  I've lived in Arizona for 34 years, minus one year where we lived in Italy.  I live on the northwest side of Tucson.

I have a bachelor's degree in marketing from University of Arizona. I work for a local beer distributor in category management and doing resets. I used to be a bartender and a server.

I am married. My wife works for the American Red Cross. We don't have any children.

I don't belong to any clubs. My one bumper sticker is the Denver Broncos logo.

And I was a juror one time. It was a child molestation case. I was the foreperson. And they were guilty.

THE COURT: Thank you.

PROSPECTIVE JUROR 26: Good morning. Juror Number 26.

I was born in Douglas, Arizona. I've lived permanently in Arizona for the past four years. I currently live in Sierra Vista.

I have a master's degree in international relations.

I am currently employed with the Sierra Vista Unified School District in the administration department. Prior to that I was active-duty military, United States Marine Corps, for 26 years.

I am currently married. My wife works as a preschool teacher. I have three children; 19, 18, and 13. The oldest and the youngest still live with me. My son is currently a midshipman at the United States Naval Academy.

I belong to the local community band in Sierra Vista.

I have no bumper stickers.

And I have never been a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 27:  Hello.  Juror Number 27.

Born and raised in Arizona my entire life.  I live on rural southwest area.

Some college.

I am currently employed.  I am a mortgage underwriter. I've been in the mortgage industry for over 20 years.

I am married.  My spouse works for the sheriff's department.  I have two children, 31 and 37, that do not reside with me.

No organizations.  No bumper stickers.

Yes, I have been on approximately three juries.  One of them was criminal trespassing; that one actually ended up getting dismissed.  The second one was arson; we found him not guilty.  And the third one was a federal case for -- involving the IRS; and we found him guilty.

THE COURT:  Were you the foreperson in any of those cases?

PROSPECTIVE JUROR 27:  No, I was not.

THE COURT:  Thank you.

PROSPECTIVE JUROR 28:  I'm Juror Number 28.

I was born in Springville, New York.  I've lived in Arizona for about seven years.  I currently live in Tucson on

the northeast side.

I have a bachelor's degree in sociology.  Not presently employed.  I am retired from the military.  I had 20 years of service.  I also have worked for -- in some retail jobs.  Health store -- health food store, and as a massage therapist.

I'm not married.  No children.

I currently volunteer for a nonprofit locally here called Watershed Management Group.  I have no bumper stickers.

And I have never sat as a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 29:  Hi.  Juror Number 29.

I was born in Delta, Colorado, but I've lived in Arizona for about 15 years.  I currently live in central Tucson.

I have a couple years at the University of Arizona and Pima County College, but no degree completed there.  I do have a certificate from Carrington College.

I am employed at Aspen Dental.  I'm a dental assistant.  I assist the dentist in dental procedures like extractions.  Formerly, I was a litigation manager, a paralegal.  Before that I worked as a waitress.

I am married.  My husband is a fleet manager for a carpet cleaning company.  I have two children, they both live with me.  My oldest will be three this month and my youngest

will be two.

No clubs or organizations.  No bumper stickers.

And this is my first time as a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 32:  Hi.  I am Juror Number 32.

I was born in Phoenix, Arizona.  I am currently living in Tucson on the northeast side.

I have a bachelor's degree in accounting.

Currently employed; I own a CPA firm.  We do fractional -- it's called Tomlinson Financial Group; I own it.  We do fractional CFO work there.  In the past, I was an auditor for other public accounting firms.

Married.  My husband sells commercial real estate.  I have two children, 17 and 19; and the 19-year-old goes to school out of state, so he does not live with me.

I am the finance committee member of the United Way. I am also the treasurer for Tucson Girls Chorus.  I do not have any bumper stickers.

And I have never been a juror.

THE COURT:  Thank you.

PROSPECTIVE JUROR 31:  I am number 31.

THE COURT:  Could you put the mic -- thank you.

PROSPECTIVE JUROR 31:  31.

I've lived in -- let's see.

Birthplace is Sacramento, California.  I have lived in

Arizona since the '70s. Presently live in south side.

Education; a little -- little education from Pima College.

I am not employed. I am retired. Former jobs, there are so many to name, that I put them behind me.

Marital status is -- I am married. Both of us, together, I guess. Spouse is busy, my grandson; so am I. We have three children; two girls and a boy. They're in their 30s, the girls. My son is about 40-ish.

No clubs. No bumper stickers.

And I did sit on a jury, but that was so long ago I forgot what it was about.

THE COURT: Thank you.

Any follow-up, Ms. Woolridge, on any questions or any other questions you may have?

MS. WOOLRIDGE: Your Honor, just one question with Juror Number 24. I believe she mentioned some previous jury service, and was just wondering about the verdict in that case.

PROSPECTIVE JUROR 24: Hi. The verdict was guilty.

THE COURT: Thank you.

Any follow-up questions or any other questions you wish to ask, Mr. Williams?

MR. WILLIAMS: No, Your Honor.

Thank you.

THE COURT: Thank you.

Do the parties pass the panel for cause?

MS. WOOLRIDGE:  Yes, Your Honor.

MR. WILLIAMS:  Yes, Your Honor.

THE COURT:  Thank you.

Ladies and gentlemen, we are going to take a short recess. Probably about 28 minutes, 25 minutes.  I am going to ask you to just stay on this floor.  You can use the restrooms on this floor.

When you come back, just stay in the back of the room.  Do not talk about what's happened here today or these proceedings or anything that's gone on this morning, but stay on the first floor.  We'll see you in about 20, 25 minutes.  We're going to finalize the final selection.  Thank you.

THE CLERK:  And please take your belongings -- take your belongings with you.

(The prospective jurors exited the courtroom.)

(Recess taken from 11:27 a.m. to 12:11 p.m.)

THE COURT:  There is a Batson challenge.

Go ahead, Mr. Williams.

MR. WILLIAMS:  Your Honor, we'd like to make Batson challenges to the government's decision to get rid of Jurors Number 1, 8, and also --

THE COURT:  Hold on.  We need -- can you put the headphones on if you are going to be listening, Mr. --

MR. WILLIAMS:  I'll say it again, Your Honor.

So we would like to make Batson challenges to the government getting rid of Jurors Number 1 and 8, also Juror Number 31.

THE COURT: Thank you.

Ms. Woolridge?

MS. WOOLRIDGE: Certainly, Your Honor.

With regard to Juror Number 1, the government --

THE COURT: Just a second, Ms. Woolridge. He's having trouble hearing.

MS. WOOLRIDGE: Is the Court ready to for me to proceed?

THE COURT: Can he hear?

Mr. Rojo-German, are you able to hear the interpreter?

And let me say, you are being assisted through our Court certified interpreter throughout the whole trial. If at any point you are not able to hear or understand the interpreter, please let us know immediately, raise your hand or let your attorney know. And it doesn't matter if you are interrupting anything that's going on in the trial; you need to let us know if you can't hear or understand.

THE DEFENDANT: Thank you.

THE COURT: Thank you.

You may proceed, Ms. Woolridge.

MS. WOOLRIDGE: Thank you, Your Honor.

I will address in numerical order the three

challenges.

First with regard to Juror Number 1, Your Honor, I've already given my list back to the clerk, so I don't know if this individual had a Hispanic surname.  She struck me as being Caucasian, but just in my mind's eye she did not strike me as being of any minority.

The reason for the government's strikes, Your Honor, was that primarily because she was a juror in a case that ended in a hung jury, and she particularly, when mentioning it was a DUI, characterized it as a "weird" DUI, and went into the circumstances a bit and had -- gave me some concerns because the circumstances almost suggested what might be considered an attempted DUI.

Here in this case, we have two charges that encompass attempted events, and so that was primarily concerning, Your Honor, to the government because she characterized a case that seems similar to -- to involve some sort of attempt as being "weird."

She also has three sons and lives with her youngest son, so there was some concern that having that close relationship with the son may have some sympathy for a younger male defendant.

Your Honor, with regard to Juror Number 8, I have very little on this juror, Your Honor.  This was actually our last strike that was taken after we actually ran out of individuals to strike.  So because I had very little on this individual --

very little information on this individual, I was -- it was someone that I thought -- because I did not know much about him.

He may have had a Hispanic last name, Your Honor. One concern is the -- he was born and raised in Nogales, Arizona, and this case does involve -- and especially if the government presents any rebuttal, may involve circumstances around the defendant's border crossings back and forth through the Nogales port of entry; so that was somewhat concerning.

But, again, I just did not have very much information about this juror with which to make a very good decision whether he would or would not be a juror that the government would want to keep.

Very similar, with regard to Juror Number 31. I do recall he was a black male. He was concerning to the government because he did not recall very much. He did not -- he mentioned that he was retired, but did not talk about any employment history. He just said, "I've had so many jobs," I have in quotes; so we have no information about what prior employment he may have.

He also couldn't remember his jury service, prior jury service, so that was concerning to the government, Your Honor. Not only because we don't know, obviously, his inclination in that regard, but also the fact that perhaps means that he did not pay very close attention or did not take it very seriously.

And, Your Honor, I'll also note that Juror Number 31 did not answer any questions until the very end.  So, again, we had, probably of all the jurors, the least information about this individual.

THE COURT:  Thank you.

Mr. Williams?

MR. WILLIAMS:  Yes, Your Honor.

We believe the government's targeting minorities with their -- with their preemptory strikes here.

With respect to Juror Number 1 -- and if I may, for the record, Your Honor, I'd like to say that I wrote down the names of the jurors.

May I -- may I pronounce their names for the record?

THE COURT:  Yes.

MR. WILLIAMS:  Yes, Juror Number 1, I had her name as Rosalinda Montemayor (phonetic spelling).  It's a Hispanic surname.  Looking at her, she appeared to be Hispanic to me.

My client, for the record, is a young, Hispanic male.  One of the issues is going to be, in this case, about Spanish -- the Spanish language.  My recollection is she's the only Hispanic female on the jury, and the government wants to get rid of her.

She indicated that she's from Laredo, Texas.

I think she stated that her husband was disabled.  I think she had a formal medical background.

As I recall, she sat on a jury, and it was hung. She didn't say which way she went, she didn't say it was guilty or not guilty, as far as the way she voted. She just said it was a hung jury and it was kind of a strange case, and she did talk about the person in the vehicle and the keys were in it. So she didn't indicate which way she went.

But we don't believe the government has provided a valid explanation for getting rid of Juror Number 1.

With respect to Juror Number 8, Your Honor.

For the record, his name is Andrew Michael Ayala (phonetic spelling). Again, another Hispanic surname. He appeared to be Hispanic.

With respect to him, Your Honor, my notes indicate that he stated he was born in Nogales, Arizona, and lived there -- I think he said for 56 years.

He -- I think he stated that he was a childcare worker, had worked for Terminix in the past. Clearly, he appeared Hispanic and had a Hispanic surname.

I have some notes here about working with home service --

THE COURT: Mr. Williams, it sounds like this is going to take a little longer. Why don't we excuse the jurors for lunch, have them come back at 1:30.

Also, any objection to excusing Mr. Lacsamana? He's Juror Number 41, and he has a proceeding at 1:30.

MR. WILLIAMS: No objections.

MS. WOOLRIDGE:  No objection.

THE COURT:  Thank you.

Let's do that, Sandy.  Can you tell them to come back at 1:30, and then go ahead and excuse Mr. Lacsamana.

THE COURT:  Thank you.

All right.  You may proceed, Ms. Williams.

MR. WILLIAMS:  So, again, with respect to Juror Number 8, we -- I was saying that I think he stated that he worked in home service, ran a childcare.

But, again, there is nothing to indicate any valid reason for striking him, other than the fact that he's a Hispanic male.  My client's a Hispanic male.

And lastly, Your Honor, with respect to Juror Number 31, his name is Cleon Lynn Thomas (phonetic spelling). Clearly, African-American male.  Just the fact that he didn't say too much isn't a good reason -- or a valid reason to strike him.  He stated that he was born in Sacramento.  He's lived in Tucson since the '70s.  He stated he's retired.  He was -- he's married.  He has three kids; two girls and a boy.  He wasn't a part of any club, didn't have any bumper stickers, and I think he said he had no jury service.

So just the fact that he didn't answer preliminary questions doesn't mean anything suspicious.  He answered the questions that were put before him, and that's really all that's required.

And with respect to him, Your Honor, he's the only African-American prospective juror, and it seems that -- to us that he's being targeted because he's a minority African-American male, and we don't think that there's been a valid reason provided by the government for striking him.

And we'd ask that these people be kept on the jury. All three.

THE COURT:  Thank you.

And the government had -- was it seven strikes available, or how many?

MS. WOOLRIDGE:  Correct, Your Honor.

THE COURT:  Seven.  Okay.

So the government had seven strikes available.  Of the seven, there were three minorities or members of a minority class.

I understand -- I do accept a valid non -- a valid neutral reason that was offered for Juror Number 1.

For Juror Number 8, I don't believe that there is enough information given.  I don't think there's any information that has to do with Nogales in this case.

And as for Juror 31, we don't have enough -- we don't have any information -- very little information, but certainly the government had the ability to follow up on any questions.

I gave both sides an opportunity to follow up, and there was no follow-up as to Juror 31 or as to Juror Number 8.

So for Juror Number 8 and Juror 31, they will stay on the panel.

And you get two additional strikes for the government.

And we can handle those at 1:00 o'clock.  Let's come back at -- let's come back at 1:15, and then we can address those -- if there is any other issues with the jury selection, and then I can have the jurors -- we'll be back by 1:30, and we can address -- bring the jurors in at 1:30.

Is there anything further that we need to put on the record?

MR. WILLIAMS:  No, Your Honor.  Thank you.

MS. WOOLRIDGE:  No, Your Honor.  Thank you.

THE COURT:  We'll see you at 1:30.

At 1:15, if need be, so we can finish the jury selection.

MS. WOOLRIDGE:  And, Your Honor, we also will need to -- I believe there are a few motions in limine pending that --

THE COURT:  Okay.  We can address those at 1:15.  They're pretty straightforward.

MS. WOOLRIDGE:  Thank you.  Perfect.

THE COURT:  Thank you.

Off the record.

(Discussion off the record.)

(A recess was taken from 12:23 p.m. to 1:27 p.m.)

(Prospective jurors not present.)

THE COURT:  The record will reflect the presence of counsel, presence of defendant.

Did you finalize your jury -- your strikes, Ms. Woolridge?

MS. WOOLRIDGE:  I did, Your Honor.  Yes.

THE COURT:  Okay.  And any objections or corrections or anything else from the defense?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  Thank you.

Also, on the preliminary jury instructions, I know, Ms. Woolridge, you submitted a corrected 1.2.  I just want to make sure that it's the same 1.2 that I read earlier, the definition.  I think I had accounted for the corrections you made.

Let me ask -- let me just take a look at the one you submitted.

Do you have a copy, Ms. Woolridge?

MS. WOOLRIDGE:  A copy of what, Your Honor?

THE COURT:  Of the 1.2 that you submitted to my chambers.

MS. WOOLRIDGE:  I have a copy of both the incorrect and the corrected version.

THE COURT:  The corrected version.

MS. WOOLRIDGE:  The only print copy I have is with my -- I do not have a -- I have my --

THE COURT: Let me show this to you and to counsel, and that way you can verify that it's the correct one.

That's the one I intend to read.

MS. WOOLRIDGE: No, that's incorrect. That's what I provided -- and it actually makes -- it actually cites the title of the wrong statute.

So I would ask that the Court instead read -- and I believe the defense did not have any objection; Mr. Williams just had a chance to look this over.

What I just submitted to the Court. I'm glad to give my --

THE COURT: If you submitted one through the e-mail, let me just check with my chambers so they can print me a copy.

MS. WOOLRIDGE: And that was -- specifically the changes are to page 4.

THE COURT: Thank you.

MS. WOOLRIDGE: This is the wrong. It was my fault. I apologize.

I think we were all rushing to get things in.

(Pause in proceedings.)

THE COURT: Can we go ahead and get the jury.

(Prospective jurors enter the courtroom.)

THE COURT: Come on in. Just take a seat back in those rows.

Take any seat or remain standing. Thank you.

You may be seated.

The record will reflect the presence of the potential jurors, presence of counsel, and presence of defendant.

When I call your juror number, you are going to come up and you are going to take a seat, starting in the second -- back row, second seat in from the left.

Juror Number 4, please come forward.

Juror Number 7.

Juror Number 8.

Juror Number 11.

Juror Number 13. 13.

Are we missing 13? Everybody look at your tags and see if you are 13.

THE CLERK: Will you give me a moment, Judge?

THE COURT: Sure.

Juror Number 14.

Leave the middle -- that seat empty, but take the next seat.

Juror Number 18.

Juror 21, you are going to be in the front row.

Juror 24.

Juror 25.

Juror 29.

Juror 31.

THE CLERK: It's actually 32, Judge.

THE COURT:  32 and 31 will switch seats.

Yeah, so Juror 32.

Juror 31, you are good.  You are just going to be at the edge.

THE CLERK:  You are not getting away.

There you go.  You have your badges.  You can put your badges on.

(Juror Number 13 entered the courtroom.)

THE COURT:  Juror Number 13, come on up.

Ladies and gentlemen, those of you whose number has not been called, you are excused.  I want to thank you for your service and for spending such a large part of the day with us, but thank you so much.

Your service here is concluded.  You are excused.

Those of you who have been selected, please stand, raise your right hand and be sworn.

(The jurors were duly sworn.)

MR. WILLIAMS:  Your Honor, if I may, I'd like to make a motion for when it comes to the selection of an alternate.

I don't know how --

THE COURT:  Could I see you at sidebar, please.

(At sidebar.)

THE COURT:  Sandy told me that Ms. Woolridge requested 32 be the alternate.  I don't know if there is any objection to that or not, but I usually just do a random selection of the

alternate or do seat 32. Whatever the parties prefer.

MS. WOOLRIDGE: I was told it would be the last seat, which is why we talked about the 32 to 31. Because my understanding was it goes in order of the seat that they're sitting in, and the last seat, which would be 31, would be our alternate.

THE COURT: We do that sometimes, and sometimes we just do random selection. Whatever the parties prefer. I always just leave it to the parties.

MR. WILLIAMS: Your Honor, for the record, I had spoken to Sandy, and it's our request that it be done randomly. I would note that the last juror is the African-American, the only African-American on the jury. I request that it be by lot randomly.

THE COURT: Any objection, Ms. Woolridge?

MS. WOOLRIDGE: Yes, Your Honor. I specifically -- because it influenced who I would then use my strikes on once I had to go make two additional strikes, and I confirmed with Sandy that it would be the last seat, which would be Juror Number 31 would be the alternate.

So because I relied on that making my two additional strikes, just in thinking about the composition of the jury.

THE COURT: I guess I'm missing if -- 32 was the last number --

MS. WOOLRIDGE: And I was told it was the last seat.

Because 32 took over for 30.  So 32 is sit -- was sitting -- I was -- we had spoken about that, and that's why it was the -- Sandy did the correction with the seat numbers, that it was on --

THE COURT:  Did she --

MR. WILLIAMS:  I didn't hear Sandy say that.

THE COURT:  But did you -- was there any objection to doing it that way?

MR. WILLIAMS:  I didn't hear that that's what was going on, Your Honor.

I came in just shortly before you got here, and I was the one that raised it saying we wanted to have it done randomly.

The prosecutor is very intelligent and she could have clarified this, I think, before she chose her strikes.

But I wasn't aware that that happened.

THE COURT:  Well, I think she clarified it with Sandy, but we're going to do just a random selection.

MR. WILLIAMS:  Thank you, Your Honor.

THE COURT:  Thank you.

(Open court.)

THE COURT:  Thank you.  You may be seated.

Jurors, you are now the jury in this case.  I want to take a few minutes to tell you something about your duties as jurors and to give you some preliminary instructions.

At the end of the trial, I will give you more detailed, written instructions, that will control your deliberations.

When you deliberate, it will be your duty to weigh and to evaluate all the evidence received in the case, and in that process to decide the facts.

To the facts as you find them, you will apply the law as I give it to you, whether you agree with the law or not. You must decide the case solely on the evidence and the law before you.

Perform these duties fairly and impartially. You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes, or preferences that people may conscientiously reject but may be expressed without conscious awareness, control, or intention. Like conscious bias, unconscious bias can affect how we evaluate information and make decisions.

This is a criminal case brought by the United States government. The government charges the defendant with smuggling goods from the United States and making false statements in connection with the acquisition of a firearm.

The charges against the defendant are contained in the indictment. The indictment simply describes the charges the government brings against the defendant. The indictment is not evidence and does not prove anything.

The defendant has pleaded not guilty to the charges, and it is presumed -- and is presumed innocent until and unless the government proves the defendant guilty beyond a reasonable doubt. In addition, the defendant has the right to remain silent and never has to prove innocence or present any evidence.

Can I see counsel at sidebar, please.

(At sidebar.)

THE COURT: I just want to check to see if that's the correct instruction.

MS. WOOLRIDGE: (Whispering.) It should be attempting to acquire.

(Voices speaking away from the microphone.)

MS. WOOLRIDGE: Yeah. Okay.

THE COURT: Is that the correct one?

MS. WOODRIDGE: That's correct.

(Open court.)

THE COURT: Jurors, to help you follow the evidence, I'll now give you a brief summary of the elements of the crimes that the government must prove to make its case.

Smuggling goods from the United States. The defendant is

charged in Count 1 of the indictment with smuggling goods from the United States, in violation of section 554(a) of Title 18 of the United States Code.

In order for the defendant to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt.

First, the defendant knowingly or fraudulently attempted to export from the United States merchandise, or received, concealed, bought, sold, or in any manner facilitated the transportation, concealment or sale of such merchandise prior to exportation, knowing the same to be intended for exportation.

Second, the exportation was contrary to United States law or regulation.

Third, the defendant did something that was a substantial step towards committing the crime and that strongly corroborated the defendant's intent to commit the crime.

Mere preparation is not a substantial step towards committing the crime. To constitute a substantial step, a defendant's act or actions must unequivocally demonstrate that the crime will take place unless interrupted by independent circumstances.

Jurors do not need to agree unanimously as to which particular act or actions constituted a substantial step towards the commission of a crime.

"Merchandise" means objects, items, goods and wares of every description.

The defendant is charged in Count 2 of the indictment with making false statements in acquisition, or attempted acquisition, of a firearm, in violation of sections 922(a)(6) and 924(a)(2) of Title 18 of the United States Code.

In order for the defendant to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt.

First, the seller of the firearm was a licensed firearms dealer.

Second, in connection with attempting to acquire a firearm from the licensed firearm dealer, the defendant made a false statement.

Third, the defendant knew the statement was false.

And fourth, the false statement was material, that is the false statement had a natural tendency to influence or was capable of influencing the licensed firearms dealer into believing that the firearm could be lawfully sold to the defendant. The evidence you are to consider in deciding what the facts are consists of:

First, the sworn testimony of any witness.

Second, the exhibits that are received in evidence.

And third, any facts to which the parties agree.

The following things are not evidence and you must not

consider them as evidence in deciding the facts of this case:

First, statements and arguments of the attorneys.

Second, questions and objections of the attorneys.

Third, testimony that I instruct to you disregard.

And fourth, anything you see or hear when the Court is not in session, even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence, that is it is proof of one or more facts from which one can find another fact.

By way of example, if you wake up in the morning and you see the sidewalk is wet, you may find from that fact that it rained the night before; however, other evidence, such as a turned on garden hose may provide an explanation for the water on the sidewalk.  Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense.

You are to consider both direct and circumstantial evidence; either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

There are rules of evidence that control what can be

received in evidence.  When a lawyer asks a question or offers an exhibit in evidence, and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question may be answered or the exhibit received.  If I sustain the objection, the question cannot be answered or the exhibit cannot be received.

Whenever I sustain an objection to a question, you might ignore -- you must ignore the question and must not guess what the answer would have been.

Sometimes I may order the evidence be stricken from the record and that you disregard or ignore the evidence.  That means that when you are deciding the case you must not consider the evidence that I told you to disregard.

In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

First, the witness's opportunity and ability to see or hear or know the things testified to.

Second, the witness's memory.

Third, the witness's manner while testifying.

Fourth, the witness's testimony -- excuse me.

The witness's interest in the outcome of the case, if any.

Fifth, the witness's biases or prejudice, if any.

Sixth, whether other evidence contradicted the witness's testimony.

Seventh, the reasonableness of the witness's testimony, in light of all the evidence.

And eighth, any other factors that bear on believability.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.  The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are and how much weight you think their testimony deserves.

I will now say a few words about your conduct as jurors.

First, keep an open mind about the trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Second, because you must decide the case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty.  Thus, until the end of the case or unless I tell you otherwise, do not communicate with anyone

in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This restriction includes discussing the case in person, in writing, by phone, tablet or computer, or any other means, via e-mail, via text messaging, or any internet chat room, blog, website or application, including, but not limited to, Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media.

This restriction also applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else, including your family members, your employer, the media or press, the people involved in the trial.

Although, you may notify your family and your employer that you have been seated as a juror in the case and how long you expect the trial to last, but if you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter. In addition, you must report the contact to the Court.

Because you will receive all the evidence and legal instruction you properly may consider to return a verdict, do not read, watch, or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research, such as consulting dictionaries, searching the internet, or using any reference materials; and do not make any

investigation or in any way try to learn about the case on your own.  Do not visit or view any place discussed in this case, and do not use the internet or any other resource to search for or view any place discussed in the trial.

Also, do not do any research about this case, the law, or the people involved, including the parties, the witnesses or the lawyers, until you have been excused as jurors.

If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible.

These rules protect each party's right to have the case decided only on evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.  Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.

Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.  A juror who violates these restrictions jeopardizes the fairness of these

proceedings, and a mistrial could result that would require the entire trial process to start over.

If any juror is exposed to any outside information, please notify the court immediately.

Every time we leave for a lunch break, I will admonish you to remember this particular rule, and tell you "remember the admonishment," and this is the rule I am specifically referring to.

At the end of the trial, you will have to make a decision based on what you recall of the evidence. You will not have written transcript of the trial. I urge you to pay close attention to the testimony as it is given.

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not let note taking distract you from being attentive. When you leave the court for recesses, your notes should be left in the courtroom. No one will read your notes.

Whether or not you take notes, you should rely on your own memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

The next phase of the trial will now begin.

First, each side may make an opening statement. An opening statement is not evidence, it is simply an outline to help you

understand what that party expects the evidence will show.  A party is not required to make an opening statement.

The government will then present evidence, and counsel for the defendant may cross-examine.  Then, if the defendant chooses to offer evidence, counsel for the government may cross-examine.

After the evidence has been presented, the attorneys will make closing arguments, and I will instruct you on the law that applies in the case.

After that, you will go to the jury room to deliberate on your verdict.

A language other than English will be used for some of the witnesses during this trial.  When a witness testifies in another language, the witness will do so through an official court interpreter.  The evidence you are to consider, and on which you must base your decision, is only the English language interpretation provided through the official court interpreters.  Although some of you may know the non-English language used, you must disregard any meaning of the non-English words that differ from the official Court interpreter.

Only the lawyers and I are allowed to ask questions of the witnesses.  A juror is not permitted to ask questions of the witnesses.  If, however, you are unable to hear a witness or a lawyer, please raise your hand and I will correct the

situation.

During the trial, I may need to take up legal matters with the attorneys privately, either by having a conference at the bench when the jury is present in the courtroom, or by calling a recess. Please understand that while you are waiting, we are working. The purpose of these conferences is not to keep relevant information from you, but to decide how certain evidence is to be treated under the rules of evidence and to avoid confusion and error. Of course, we will do what we can to keep the number and length of these conferences to a minimum.

I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or what your verdict should be.

Does the government wish to make an opening statement?

MS. WOOLRIDGE: Yes, Your Honor. Thank you.

THE COURT: Thank you.

MS. WOOLRIDGE: Good afternoon, ladies and gentlemen.

It's easy money. All the defendant, Efren Rojo-German, all he had to do was to get a gun and help smuggle it to Mexico for his friend Johnny.

See, you can't just buy a gun in Mexico; and Johnny couldn't legally come into the United States to buy a gun himself. Plus, even if Johnny did, he couldn't -- it would be

illegal for him to take that gun back to Mexico.

So Johnny and the defendant come up with a plan; a seemingly pretty easy plan.

The defendant is a U.S. citizen, and he crosses back and forth between the United States and Mexico quite regularly. And it's relatively easy to buy a gun in the United States, especially here in Arizona.  So the plan seems easy enough.

Johnny will pay the defendant to buy a gun for him, the defendant will bring the gun to just north of the border, where another associate of theirs will smuggle the gun into Mexico and give it -- and provide it to Johnny.

And they'll even make a fake bill of sale; so if the defendant is ever asked why he doesn't have that gun anymore, he can just claim he sold it.

Easy enough, right?

There's just one problem with this easy plan for the defendant to make easy money:  It's against the law.

It's illegal to attempt to buy a gun from a gun store in the United States on behalf of someone else.  And it's illegal to attempt to smuggle a gun into Mexico.

And you'll see the defendant runs into a few snags in his seemingly easy plan.  But as you'll also see, he's very determined to make that easy money.

First of all, the first snag the defendant runs into is the fact that he's a convicted felon; so he's actually prohibited

by law from buying or possessing a firearm in the United States.

But that's not going to stop the defendant, not from making that easy money. So he comes up with a modification of a plan; he comes up with a solution to that snag.

He brings in his friend, Gina, on the plan. And for a cut of the profit, Gina will come along with the defendant to the gun store where the defendant will pick out the gun that Johnny wants, pay for it, and take the gun to be smuggled to Johnny in Mexico, and get his fake bill of sale to cover it all up.

All Gina has to do is fill out the paperwork and claim the gun is for her, so when the gun store does the mandatory background check, it will be a background check on Gina, who is not a convicted felon like the defendant, and, therefore, not prohibited from buying a gun.

Easy enough, right?

Well, here's the second snag. Gina doesn't speak English. But, again, the defendant is determined to make that easy money, and so that's not enough to stop him.

The defendant is bilingual. He speaks and understands both English and Spanish, and so he'll not only pick out the gun for Johnny, he'll also act as Gina's interpreter at the gun store and help her fill out the form.

Easy enough, right?

So, May 19th, 2021, the defendant goes to Murphy's Gun

Shop, a licensed gun dealer here in Tucson, Arizona, and he brings Gina along with him.  The defendant picks out the gun that Johnny wants, that Johnny told him to get.  He talks to Patrick Murray who works in the -- in the gun store.  In fact, he's the owner's son.  And he tells Patrick -- the defendant tells Patrick he wants this gun to use on the ranch, says, It will be perfect for my ranch.  He handles the gun, manipulates the slide, checks it out, says he wants to buy it.  They talk in English.

But then when it comes time to fill out the paperwork for the background check, the defendant has Gina come over and says, Oh, actually she's buying the gun.  And Gina only speaks Spanish, so he'll act as the go-between between Patrick and Gina.

Wait a second, Patrick says to the defendant, You just said this gun was for you, that it would be perfect for your ranch.  You were the one handling the gun.  You are the one that seems interested in the gun.

Gina, as you'll see from the surveillance video, is just kind of wandering around the store aimlessly.

If the gun is really for her, okay.  But if it's for you, she can't fill out the paperwork, that's against the law, and I couldn't sell you the gun then.  So if this gun is really for you, you have to fill out the paperwork.

So there's the defendant's third snag.  Plan's not -- not

working so well, but still not enough to stop him from trying to make that easy money.

Fine, the defendant says. All right. He'll just fill out the paperwork. Maybe, just maybe, the background check won't catch the fact that he's a convicted felon. Maybe he'll still be able to make that easy money after all. He's come this far. At this point, what has he got to lose, right?

A lot, ladies and gentlemen.

Because when the defendant filled out that paperwork, he committed a crime.

For those of you who aren't familiar with buying a gun from a licensed gun store, Form 4473 is the paperwork required by federal law to be completed every time a person buys a gun from a gun store. It's a very important form because it helps ensure that guns don't end up in the wrong hands. It's the formal documentation of every gun sale here in the U.S. from a licensed dealer; so it's also critical for law enforcement when they trace guns that are recovered at crime scenes.

Now this form doesn't apply to private, or what we call person-to-person firearm sales or transfers. But it is required for all dealers, or what we call gun store sales. The dealer relies on the information -- relies on the customer being honest, correctly filling out the form. The dealer then uses the information that the customer writes on the form to conduct the background check that's required by law.

So when a customer says that they're the actual buyer of a firearm but really they're buying the gun for someone else, what's known as a "straw purchase" -- you may have heard this term; you'll probably hear it during this case.

When a person does that, makes that false statement, they're deceiving the dealer and really thwarting the entire background check process; and this, in and of itself, is illegal.

It is against federal law to make false statements on Form 4473. Whether or not you actually end up buying the gun, it's an official government form and, in bold, warns the -- the person filling out the form, before they sign it, that making any false statement on the form is a crime under federal law.

And as you'll hear, the defendant actually made two false statements when he filled out the form. First, he said the gun was for him, that he was the actual buyer, when really he was buying it on behalf of Johnny. And second, he said he was not a convicted felon, when, in fact, he was.

Well, fortunately here, ladies and gentlemen, the background check worked. It notified Patrick Murray that the defendant was, in fact, a convicted felon, and Patrick refused to sell the defendant the gun that the defendant was trying to get for Johnny.

So the defendant then gets on his cell with his buddy in Mexico, tries to come up with another way around this snag,

because he really wants to make this easy money.

Meanwhile, Gina kind of just wanders aimlessly around the gun store. She is just there to follow what the defendant tells her, and she can't talk to anyone else without him interpreting for her.

Well, eventually, after being on the phone for quite some time, the defendant gives up and leaves, taking Gina with him; and fortunately, the defendant was not able to acquire that gun for Johnny in Mexico and make that easy money.

But he had already committed his crimes. He had made material false statements to the licensed firearm dealer on the Form 4473, and he attempted to assist in the plan to smuggle that gun into Mexico, because he knew that that's where it was ultimately going.

Ladies and gentlemen, during this trial you'll hear the testimony of the law enforcement agents who investigated the defendant's crimes. You'll hear the defendant's own admissions of his unlawful acts.

When he was interviewed, the defendant admitted that Johnny asked him, the defendant, to buy Johnny a gun because Johnny lives in Mexico and couldn't come into the U.S. himself; that the defendant said he knew he couldn't buy and possess guns himself, so he brought along a woman to help; and in fact, he and the woman had gone to another gun store before they came to Murphy's, but they didn't find what Johnny wanted.

The defendant says Johnny told him what kind of gun to buy and Johnny said he was going to pay him for buying it.  The defendant said he was going to provide the gun to someone else to smuggle across the border into Mexico, and that person would give him that fake bill of sale so he wouldn't get in trouble.

The defendant knew what he was doing was wrong.

You'll hear about the defendant's cell phone.  In fact, he actually had two cell phones.  One with a U.S. number, one with a Mexico based number.  And he used that second one, the Mexico based one, to communicate with his associates in Mexico in furtherance of this gun smuggling scheme.

On that phone, there's a saved contacts named "Johnny" with a Mexico number.  There are WhatsApp conversations on the phone where the defendant would provide information about guns for sale to other folks in Mexico, talk about buying guns for them, discuss prices, ask how many guns to buy.  And, in fact, one of these associates sent the defendant a photo of the pistol he wanted the defendant to buy.

You'll hear from Patrick Murray, the son of the gun store owner, who interacted with the defendant while he committed his crimes.  You'll see the surveillance footage, both from inside and the exterior parking lot, of Murphy's gun shop, and so you'll see the defendant as he's going through the acts of committing his crimes.

And you'll see the Form 4473 that the defendant filled out

when he lied in his attempt to buy the firearm for Johnny, to help smuggle the gun into Mexico for Johnny, to make that easy money.

And, ladies and gentlemen, after you hear and see all of this evidence, the government submits to you that you'll be firmly convinced that the defendant is guilty of his crimes, guilty of making false material statements in the attempted acquisition of a firearm, and guilty of facilitating the attempted smuggling of a firearm from the United States into Mexico.

Thank you.

THE COURT:  Thank you.

Mr. Williams, do you wish to make an opening statement?

MR. WILLIAMS:  Yes, Your Honor.  Just briefly.

THE COURT:  Thank you.

MR. WILLIAMS:  Good afternoon, ladies and gentlemen.

The evidence in this case is going to show that Mr. Rojo-German, my client seated to the right, is 26 years old.  The evidence is going to show that he was born in the United States.  And at the age of about one to two, his mother was deported to Mexico, and he went with his mother to Mexico.

Further, you'll hear that my client lived in Nogales, Sonora, Mexico, until he was about age 12 and attended school in Nogales, Sonora, Mexico, speaking Spanish and learning

Spanish.  You'll hear that he lost a year of school in Mexico.

His father lived in the U.S., and his mother had to live in Mexico.  So at about the age of 12, he started to spend time with his father in the United States, and he would go back and forth across the line.

The evidence is going to show that he started to attend school here in the United States at about age 12, 13, around that time, and that he didn't do good in school.  In fact, he didn't even finish high school.  In fact, his English, he couldn't understand it, and that's one of the reasons why he failed and was not able to graduate from high school.  In fact, he did not obtain a GED.

And you'll hear that the jobs that he's had, and what jobs that he has had, have always been, essentially, Spanish-speaking jobs where you don't have to speak English.

You'll hear, ladies and gentlemen, that the agents in this case actually approached my client to try and get him to work for them.  So when the prosecutor talks about gaining money, you are going to hear how the government agents essentially offered him money to work for them, and that much of what you've heard came in the context of the government agents trying to recruit my client to work for them and --

MS. WOOLRIDGE:  Your Honor?

THE COURT:  Can I see you at sidebar.

(At sidebar.)

MS. WOOLRIDGE:  This is absolutely inappropriate.

We filed a motion to preclude any statements that the defendant was working or was approached by the government to work for them.

First of all, this all predates the defendant's offense in this case.  It has to do with a previous arrest by the defendant in association with other criminal activity that the government is not going to get into.  We're only going into the crimes that are charged here.  So it opens the door to other bad acts of the defendant, which we were not going to introduce.

But, Your Honor, even more to the point, the defendant never raised a public authority defense, never gave any notice of this.  This is wholly improper; it's irrelevant.

MR. WILLIAMS:  Your Honor, I think it's -- assuming my client decides to testify, all the things that I am saying are consistent with what we can testify to.  And it is relevant because much of the information the government agents obtained from him came during these conversations they had with him prior to this incident.

THE COURT:  Okay.  There's a couple of problems here.

Are you relying on a public authority?

MR. WILLIAMS:  No, no, no.

THE COURT:  Okay.  Then why is it relevant?

MR. WILLIAMS:  Well, because the information that they

obtained from him about this person named Johnny, this information came up before my client was arrested in this case.

MS. WOOLRIDGE: It came up before he as -- no, it did not. Your client was arrested -- they knew about it -- I think he may have mentioned the name Johnny, but as far as the -- that was with regard to other information, other suspected crimes.

This was -- that was all before May 19th, when he committed this offense. It had nothing to do with the May 19th offenses that are charged in this case. He was not -- he did not make the statements that we're getting into until June 3rd, when he was arrested at the port of entry in an alien smuggling offense, which we're not getting into.

MR. WILLIAMS: Right.

THE COURT: The problem is going to be, Mr. Williams, if you start getting into a lot of these statements -- first of all, if your client doesn't testify to them --

MR. WILLIAMS: Right.

THE COURT: -- there's going to be an issue.

Second of all, you are going to be opening up the door to other crimes that have not been alleged here.

MR. WILLIAMS: Right. Well, I'll move on, Your Honor, but she has mentioned --

THE COURT: Why don't you move on and we can handle -- if for some reason you feel that it's going to become relevant,

let's discuss it before you present it to the jury.

MR. WILLIAMS:  Okay.  I'll move on.

MS. WOOLRIDGE:  I would ask for an instruction the jury disregard this.  I filed the motion for the specific reason that this wasn't brought up.

I think that was entirely improper, Mark.

MR. WILLIAMS:  Well, I disagree.

MS. WOOLRIDGE:  If you disagree you should have asked for a hearing in front of the Court.

MR. WILLIAMS:  Well, I don't think we've had any motions in limine discussed yet.

MS. WOOLRIDGE:  And I didn't go into anything in your motions.

THE COURT:  So let me --

MR. WILLIAMS:  I'll move on, Your Honor.

THE COURT:  Hold on.  I'm just wondering if we need a curative instruction as to -- I don't want to call attention to it in the event that -- that we need to, but...

MS. WOOLRIDGE:  I would at least then ask for instruction that the jury is instructed that what -- what counsel says is not evidence and they've heard no evidence of this.

THE COURT:  Maybe I'll do that then.

MR. WILLIAMS:  (Indiscernible) for both of us.

(Open court.)

THE COURT:  Ladies and gentlemen, I'm just going to remind you that these are opening statements.  What the lawyers say is not evidence.  So I am just going to ask you that you pay close attention to the testimony in this case and consider that these are just opening statements by both the attorneys.

Thank you.

MR. WILLIAMS:  Thank you, Your Honor.

THE COURT:  You may continue.

MR. WILLIAMS:  Thank you, very much.

So, continuing on, on May 19th, you are going to hear that my client went with a female to Murphy's Gun Shop, and that they met a man named Patrick Murray, a white man, who gave a form to my client to complete.

The evidence is going to show that my client has never purchased a firearm, never completed one of those forms before, and you'll see that the form is in English.  You are going to see it's not in Spanish, it's in English.  And you'll further see that my client wasn't the only one that completed that form, that -- in fact, Patrick Murray put information on the form, and you'll hear when that happened and how it happened.

The evidence is going to show that my client answered the questions as he honestly thought the questions called for.  There will be no evidence that my client knowingly made a false statement on the form.  So the two questions that are at issue in this case on the form, you'll see that they're in English,

and you'll hear that my client answered those questions to the best of his ability, as he was instructed by Patrick Murray.

The evidence is going to show that apparently Patrick Murray had a form in Spanish, but he did not give that form in Spanish to my client. He gave him a form in English and told him to complete it to the best of his ability.

With respect to Count 1 of the Indictment, you are not going to hear any evidence that my client knowingly or fraudulently attempted to export anything from the United States to Mexico. There will be no evidence of that.

With respect to that Count 2 charge, we are convinced that after you've heard all the evidence in this case from the witnesses, from the video, from whatever recordings the government has, that you'll be convinced and we'll ask you to find Mr. Rojo-German not guilty of the two charges.

Thank you, very much.

THE COURT: Thank you.

And, Ms. Woolridge, you may call your first witness.

MS. WOOLRIDGE: Thank you, Your Honor.

The government calls Special Agent Creighton Brandt, with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

THE COURT: Please come forward, sir.


**CREIGHTON BRANDT**, WITNESS, SWORN

THE CLERK: Once you are comfortable, speaking

directly into the microphone, state your full name for the record and spell your last name.

THE WITNESS:  My name is Creighton Brandt.  And my last name is spelled B-r-a-n-d-t.

THE COURT:  You may continue.

MS. WOOLRIDGE:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. WOOLRIDGE:

Q.  Good afternoon, sir.

We've just heard your name.  Can you please tell the jury what your occupation is.

A.  Yes.  I am a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, commonly referred to as "ATF," and that's here in Tucson.

Q.  How long have you been employed with ATF here in Tucson?

A.  With ATF, I have been employed for -- for almost 14 years.  About 13 and a half years.

Q.  And do you have any sort of employment in the law enforcement field, prior to working with the ATF?

A.  Yeah.  Before ATF, I was a police officer, a detective, and a sergeant with the Colorado Springs Police Department, in Colorado, for almost 12 years before leaving in the end of January 2009 to take a position with ATF.

Q.  And throughout your position with ATF, can you just give us a brief description of -- of what type of responsibilities,

what kind of roles you had, and what kind of role you have now?

A.   Sure.   Absolutely.

When I was hired with ATF, I came to Tucson, Arizona, in August of 2009, and I worked a variety of investigations, from firearms trafficking to violent crime investigations, narcotics investigations, home invasion investigations.

And then in 2016, I promoted to resident agent in charge of the ATF office in Wichita, Kansas.  I was the resident agent in charge and responsible for ATF's operations in most of the State of Kansas for a little over two years.

I came back to Tucson in 2018, where I served as the resident agent in charge of one of the Tucson field offices, and then voluntarily stepped down in 2019 to avoid a move to Washington, D.C.  So I started doing investigations again in 2019.

And then just earlier this year, I was selected to be an explosive detection handler for ATF, so now I have an explosive detection dog, and that's my current assignment.

Q.   All right.  And in your current role -- well, let me back up a little bit.

I imagine you've had to undergo some sort of training and education to hold your current role as an ATF agent?

A.   Yeah, that's correct.

In 2009 when I was hired, all ATF agents go through a 12-week course, it's in Georgia, in Brunswick, Georgia, at the

Federal Law Enforcement Training Center. It's basically an introduction to criminal investigations. It's called the Criminal Investigation Training Program, CITP. Again, it's a 12-week course.

Following that, with ATF we have a 16-week add-on course. So for an additional 16 weeks, again in Georgia, we go through an academy that's specific to ATF violations where we receive additional training.

Q. Is part of the ATF kind of plethora of investigations that -- that you've been trained on and that you investigate involve firearm purchases from licensed firearms dealers in the United States?

A. Yes, it is.

One of the areas that ATF -- I guess one of our responsibilities as an agency is -- I don't do it because I'm in a criminal enforcement capacity, but we have regulatory folks that regulate and work with federal firearms licensees throughout the country, and those are -- those shops are commonly called like gun stores or FFLs, standing for "federal firearms licensee."

Q. So you mentioned that you have folks with ATF that oversee these operations, these gun stores, or "FFLs" as you called them.

Are there certain laws that the -- these stores must comply with when engaging in their business of dealing and selling

firearms?

A. There are. If they're going to be in the business of dealing firearms and they're going to be licensed by the federal government, there are a variety of rules that they have to follow before they can become a federal firearms licensee. And then once they're open to sell guns to the general public, there is a variety of laws as well that they have to follow.

Q. Okay. Included in those laws, are there certain requirements as far as the type of records that they must keep?

A. Yes, there -- there are.

Q. And without getting too far in the weeds of what's required of the licensed firearms dealers, are there also record requirements that apply to individuals who might come into a gun store to buy a gun?

A. Yes, there are.

Whenever an individual goes into a gun store, they're required to complete what's called an ATF Form 4473, it's a firearms transaction record. And when they want to purchase a firearm, they have to complete a portion of the ATF Form 4473 in order to lawfully acquire that firearm.

Q. Is that absolute, you know, across the board? Every time anyone buys a gun from a gun store, they must themselves fill out a portion of that form?

A. That is correct, yes.

Q. Now, can a federal licensed dealer face repercussions if

they don't keep this paperwork?

A.  Yes, absolutely.

They're required to not only ensure that an ATF Form 4473 is sold (sic) every time someone purchases a firearm, but they're also required to ensure that the form is completed thoroughly, that they're completing a background check on the individual that's acquiring the firearm, things like that.

Q.  You mentioned background check, and so I -- I want to kind of delve into that area a little bit more.

First of all, is there a difference -- is there a distinction between the sales or transfers of firearms that happen at licensed gun dealers, these gun stores, or FFLs as we're calling them, and just kind of a private citizen, you know, maybe hand-to-hand, or what we call secondary market sales?

A.  Yeah, absolutely.

Again, gun stores, these FFLs, are regulated by ATF.  They have federal firearms licensees.  So if I was to go into, let's just say, Sportsman's Warehouse, for example, and I wanted to purchase a firearm, I would be required to complete this ATF form.  I would complete a portion of it, the FFL would complete a portion of it, a background check would be completed.  Once I passed the background check, then I can obtain the firearm.

Whereas if I was to purchase a firearm from you, let's just say for example, I would not have to complete a background

check in order to obtain that firearm; I could just buy it directly from you.

Q. Okay. Are there separate laws, then, that -- that apply to individuals who are, let's say, selling firearms that are separate -- that are a different body of law than what applies to firearm dealer sales?

A. Yes, there are.

Q. And so focusing on the firearm dealer sales, you mentioned a couple of times a background check.

What is a background check, and why is it so important?

A. Sure. Absolutely.

The Federal Bureau of Investigation, or FBI -- it's kind of an interesting dynamic, because if I was to go into a gun store and buy a gun, I complete an ATF regulated form; however, the FFL will then call the FBI in order to do a background check.

And the reason why they -- the FBI administers the background check portion of a firearms purchase, but the reason, and most importantly as to why a background check is completed, is obviously there is various things that would prevent someone from lawfully acquiring a firearm. And one of the things that's required is a person cannot have a criminal history or a felony conviction or a misdemeanor crime of domestic violence, things like that, in order to obtain a firearm.

Q. Are there also a number of other factors that could perhaps

prohibit a person from buying a firearm?

A. There are probably about 10 different factors that would prevent someone from obtaining a firearm.

Q. So what's to stop, let's say, someone who has one of those convictions, a felony conviction or a domestic violence conviction, from -- from just having someone else go into the gun store and buy a -- buy a gun for them?

A. I mean, that certainly does happen. We have had investigations where an individual can't obtain a firearm because they have a criminal background, or they don't want their name associated with the purchase of that firearm, so we do investigate instances where somebody will have another individual go into a gun store, complete the ATF Form 4473, and then eventually turn the firearm over to the other individual that it was intended to go to.

Q. Is that legal?

A. It is not legal. It's illegal.

Q. Is there anything on -- within the form itself that -- that specifies that this is illegal?

A. Yes. Definitely.

Q. And are you familiar yourself with the Form 4473?

A. I am. Yes, I have -- in my time with ATF, I have reviewed several, several, several hundred, probably maybe even a thousand, different 4473s.

Q. And you mentioned it's an ATF form. Is that an official

government record that actually belongs to the ATF?

A. It does belong to the ATF. In fact, if a gun store goes out of business or they change their name, they're required to send all of their -- of the original ATF Form 4373s to the ATF Out of Business Records, which is out on the east coast.

Q. And otherwise are they kept then in the possession of the store themselves?

A. Yes. They're -- the FFL is required to maintain possession of these ATF Form 4473s.

Q. So going back to the background checks. Someone comes into a gun store, they fill out the Form 4473, the gun store does a background check on that individual.

What -- what happens as a result of the background check? What can happen?

A. Well, there's three different possibilities really when somebody completes a 4473.

One, after the background check is conducted, the -- the FBI can tell the FFL, hey, go ahead and proceed with the sale. Then at that time, the firearm would be sold and the individual, the customer, would walk out of the gun store after making payment with the firearm.

Two, another possibility is denied. And that would be an instance where the FBI is given the name and the date of birth, sometimes the Social Security number. They look at their database and they determine, hey, this person has a criminal

history, they cannot have a firearm. So the FBI would deny that transaction.

Then the third possibility is what we call a delay. And that is, hey, the individual has something in their background check; so you can't sell the firearm today, but please give us additional time so we can conduct more research to see if this individual can lawfully purchase this firearm.

Q. Are you sometimes informed of instances where individuals attempt to buy a firearm from a licensed firearms dealer and there is a denial? The background check comes back and the FBI says this person is prohibited, do not transfer the firearm to them.

A. Yes, there are instances we receive that information.

Q. And did you receive information about such an instance involving the defendant in this case, Efren Alexis Rojo-German?

A. Yes, we did.

Q. And was that a case, just as we -- we spoke about, where the defendant attempted to purchase a firearm from a licensed firearms dealer, but the result of the background check was a denial?

A. Yes, that is correct.

Q. Do you recall what the name of the gun store was?

A. It was Murphy's. I believe it's Murphy's Gunsmithing. It's a gun store here in Tucson.

Q. Are they a licensed firearms dealer operating within the

regulations formulated by federal law?

A. Yes, they are.

Q. As such, are they required to keep these Form 4473s as official ATF records?

A. Yes, they are.

Q. So in this case, were you able to get the actual form that the defendant in this case, Mr. Rojo-German, filled out in attempting to buy this firearm?

A. Yes, we are.

Or yes, we were. Sorry.

Q. Have you had an opportunity to review that form?

A. I have, yes.

Q. Sir, I'm just going to step over here and ask Ms. Fuller to turn on the screen.

Sir, do you see an image up on the screen before you?

A. Yes, I do.

Q. I am showing you what's been marked as Exhibit 8.

Do you recognize at least the first page of this document that you see there?

A. Yes, I do.

Q. What do you recognize it to be?

A. It's a copy of the ATF 4473 that I obtained a copy of during this investigation.

Q. And just flipping through the entirety of the document. I just want to give you an opportunity to -- to review it

completely to ensure that you recognize it.

MS. WOOLRIDGE:  Just for the record, I am showing the witness what has not yet been exhibit -- not yet been admitted as Exhibit 8.  And there are three total pages to Exhibit 8.

BY MS. WOOLRIDGE:

Q.  Sir, do you recognize -- after looking at each of these three pages of Exhibit 8, do you recognize this to be a copy of the form that you obtained in the investigation of this case?

A.  Yes.  It is.

MS. WOOLRIDGE:  Your Honor, move to admit, and publish for the jury, Exhibit 8.

THE COURT:  Any objection?

MR. WILLIAMS:  Yes, Your Honor.  We object on foundation grounds, hearsay, confrontation clause.

THE COURT:  Overruled.

Exhibit 8 is admitted and may be published.

MS. WOOLRIDGE:  Thank you.

BY MS. WOOLRIDGE:

Q.  Now again, just for the record, we are just looking at this point to the first page of Exhibit 8, which is a three-page document.

Sir, just speaking about the first page here, with the exception of a couple of black rectangles that we see that have been added just by the government in this case to redact any PII, or personal identifying information, such as month and

date of birth and Social Security number, is this how the form appeared when you obtained it from Murphy's Gunsmithing?

A.   Yes, it is.

Q.   Were those rectangles there at the time, or were you able to actually view the data in there?

A.   The rectangles were not there when I first obtained the form; you could see the entire date of birth and Social Security number.

Q.   I'm going to take a moment with you, sir, to zoom in and go through specific sections of this form.

Is the Form 4473 divided into sections?

A.   It is divided into sections, yes.

MS. WOOLRIDGE:  And for the record, we are looking at the top of page 1, in the -- specifically in the area designated as section A.

BY MS. WOOLRIDGE:

Q.   What is the significance of section A, sir?

A.   Section A is -- describes the firearm that -- you know, that the individual is interested in purchasing.

Q.   Who fills out section A?

A.   It's completed by the FFL, by the business that's selling the firearm.

Q.   And does the form require that section A must be completed by the business?

A.   Yes, it does.

Q.   And is that completed first -- first and foremost, the first section filled out?

MR. WILLIAMS:   Objection.   Foundation.

THE COURT:   Rephrase your question.

BY MS. WOOLRIDGE:

Q.   Does the form require that section A be completed essentially as the first section before the buyer, or attempted buyer, fills out any information, him or herself?

A.   Yeah.   I'm not sure the order, but it's a very important piece of information because it specifically states the firearm that's being purchased.

Q.   Then following section A, is there a portion that must be completed by the buyer and no one else?

A.   Yes, that is correct.

MS. WOOLRIDGE:   For the record, I am going to move up our piece of paper here, the first page.   I'm going to zoom out a little bit to get the rest of that page.

BY MS. WOOLRIDGE:

Q.   Does the form specifically state that section B must be completed personally by the transferee or buyer?

A.   Yes, that is correct.

Q.   So everything that we're looking on our screen, section B, followed by boxes 19 through 21a through e, must this all be filled in by the buyer personally?

A.   Yes.   Starting in box number 9, and then continuing through

a number of questions in -- in question 21, you have 21a, b, c. It continues onto the next page.

And then even on the next page, there's another portion that the buyer would attest to with their signature.

Q. Let's -- before we get into that, let's specifically talk about boxes 9 through 20.

Special Agent, what is the nature of this type of information that's required by the buyer to fill out in boxes 9 through 20?

A. The nature of this information is to accurately obtain the individual that is looking to obtain or acquire the firearm in question.

Q. So I mean, can you just explain to the jury -- I know they can see the form in front of them, but generally what kind of questions is this asking?

A. Yes, absolutely.

So obviously in box 9 you have the last name, the first name, the middle name. And you will note that in the -- in the middle name they don't want the initial, they want the entire, like, middle name.

And then in box 10, they want an address and they want the current address, which typically will be the address that's on someone's Arizona driver's license or identification card.

And then boxes 11, 12, 13, 14, 15, and 16 have more identifying information about the individual from their height,

and box 12, their weight.  You can see that in box 13, obviously their gender.  And 14, it includes the date of birth, Social Security number, as well as the city and state, going back up to box 11, where they were born.

And then box 18 is two parts.  It asks in 18a the ethnicity.  And then in box 18b, it specifically asks for the race.  And then in 19, it specifically asks about the country of citizenship.

THE COURT:  Ms. Woolridge, can we take our afternoon recess at this time?

MS. WOOLRIDGE:  Absolutely, Your Honor.

THE COURT:  Let's do that.

Ladies and gentlemen, let's take our afternoon recess. We'll see you at about 3:05.

Please follow Sandy, so she can give you some directions.

(Jury out.)

(Recess taken from 2:48 p.m. to 3:11 p.m.)

(Jury in.)

THE COURT:  The record will reflect the presence of counsel, presence of jurors, and presence of defendant.

You may continue, Ms. Woolridge

MS. WOOLRIDGE:  Thank you, Your Honor.

BY MS. WOOLRIDGE:

Q.  Special Agent Brandt, when we took our afternoon recess we

were going over Exhibit 8, the 4473 Form applicable in this case.

And you were talking about section B, the portion that is to be completed by the buyer of a firearm, or the attempted buyer of a firearm.

I believe we were talking about the biographical information required for the buyer to fill out in boxes 9 through 20. And you had spoken about -- I believe we were talking about the box 18, the ethnicity and race sections of the form.

And before -- actually, I wanted to back up to box 17 because there is -- I don't -- I see in this particular box that it's blank, but it -- the information, I'm not sure if it is an acronym or a category of information with which I am familiar.

So can you explain to the jury what's being asked for in box number 17.

A.   That's a very good question.

I don't know exactly. I don't know that I have ever seen that box be completed before.

Q.   Okay. So a UPIN or an AMD ID, that's not something that the typical buyer of a firearm has or fills out?

A.   Correct. I'm not even sure specifically what -- what that is asking for.

Q.   Okay. And it says, "if applicable," so does that designate

that it may not apply to all buyers?

A.   Correct.

     Like I said, I have reviewed a lot of 4473s, I have never seen information in -- in that particular box.

Q.   And I also see that box 20 is blank.

     What is that asking for?

A.   Yeah.  So you don't have to necessarily be a U.S. citizen to purchase a firearm.  You can be from another country and still qualify to purchase a firearm, but there has to be certain conditions that are met.

Q.   All right.  In this case, did the individual fill out that -- that they were a United States citizen?

A.   Yes, correct.

Q.   So then because that was checked in box 19, is there anything wrong with box 20 being blank?

A.   No, not at all.

Q.   In fact, is that what you would expect?  If someone is a U.S. citizen, they would not fill out information if they were an alien?

A.   Yes, correct.

Q.   Okay.  So just -- just looking at boxes 9 through 20, have you ever come across a form where someone fills out, for whatever reason, just a mistake or a misunderstanding, fills out any of their biographical information incorrectly?

A.   Yes.

Q.  Okay.  What happens then?

A.  Typically what I have seen is the individual -- whether it's the person that completed it wrong or maybe the FFL that caught it, but in the instances that I have seen, they've put a line through it, made -- put their initials next to the line and then put the correct information, like above where the mistake was made.

Q.  Okay.  Here, were there any mistakes on the form?

A.  In section B, I did not see any.  No.

Q.  Okay.  Any corrections made?

A.  No.

Q.  Anything in this form where it just appears to be off?

For instance, let's say you know it asked for weight given in pounds, does that -- anything -- anything weird about that, or anything -- anything just seeming off in -- in any of the boxes 9 through 20?

A.  No.

Q.  Okay.  Moving down to question 21.

MS. WOOLRIDGE:  And just for the jury, I am going to flip to the second page.

BY MS. WOOLRIDGE:

Q.  So we see on the first page of Exhibit 8, questions 21a through E.  And on the second page -- I'm just going to remove the paperclip to make this a little bit easier.

On the second page, continuation of question 21, sections f

through k.  Then 21 -- I should say f through k, and l.1 and 2.

A.  Yes.  Those are additional questions, just like we talked about before, there's -- there are certain things that would prohibit someone from acquiring or purchasing a firearm from a gun store.

So what these questions are in 21 -- remember, I mentioned there was approximately 10 of them.  And I would need to count to get the exact number.  But basically what these questions are is they're going through all the different things that would prohibit someone from being able to acquire a firearm.

Q.  Okay.  So starting off at the beginning, then, of question 21, let's talk about question 21a.

What's the significance of that?

A.  So if somebody goes into a gun store to buy a firearm for themselves, they're the actual recipient of the gun, that is a lawful transaction.

If I go into a gun store to purchase a firearm for someone that can't, or they do not want their name associated with that firearm, that is illegal and it can't be done.

So what question 21a is asking, is it's asking the purported buyer if this gun that they're -- or firearms, if they're buying more than one -- is this really for them.  That's what that question is asking.

Q.  Well, of course, you as an ATF agent, knows -- knows that would be illegal.

Is there anything in this form, specifically in 21a, that lets that buyer know, hey, you don't get to -- you can't lawfully buy a gun on behalf of someone else?

A.   Yeah, there's a -- there's a warning.  It's in bold.

It says:  You are not the actual transferee/buyer, if you are acquiring the firearm or firearms on behalf of another person.  If you are not the actual transferee/buyer, the licensee, the FFL, cannot transfer the firearm or firearms to you.

Q.   And did -- what box, yes or no, did Mr. Rojo-German check in question 21a?

MR. WILLIAMS:  Your Honor, I'm going to object.

May we approach?

THE COURT:  Yes.

(At sidebar.)

MR. WILLIAMS:  Your Honor, I am going to object on foundation grounds.  And she's -- the question is what did Mr. Rojo-German check.

This witness wasn't there to see what he checked. There's been no -- there's been no testimony that Mr. Rojo-German completed this form.

THE COURT:  You need to rephrase your question.

MS. WOOLRIDGE:  Sure.

THE COURT:  Thank you.

(Open court.)

THE COURT: You may continue, Ms. Woolridge.

MS. WOOLRIDGE: Thank you, Your Honor.

BY MS. WOOLRIDGE:

Q. Special Agent Brandt, what box is checked in answer to question 21a?

A. He checked the box that indicates "yes," that he is the actual transferee or buyer of the firearm.

Q. All right. And then going down to questions 21b through e, the rest of page 1 of Exhibit 8.

Are there any questions -- are these questions that have to do with information that may indicate whether a person is prohibited from purchasing firearms or not?

A. Yes, that's correct.

Q. Is there anything -- any question here that asks whether a person has ever been convicted of a felony?

A. Yes.

Q. And what section is that?

A. That is 21b, as in "boy."

Sorry. 21c.

Q. What is -- what box was checked, yes or no, to the question: Have you ever been convicted in any court, including a military court, of a felony?

A. He checked "no."

Q. Are all the other -- with the exceptions of question 21a, are all of the boxes checked in question 21 "no"?

A.   Yes, that's correct.

Q.   Okay.  And if the box was checked of "yes" in any question in 21, other than 21a, would that likely prevent the firearm dealer from selling the firearm?

A.   Yeah.  If any of those, 21b through k, are checked "yes," then the FFL cannot continue with the sale of the firearm.

Q.   I see, though, that one of these questions -- one of these boxes, there is no "yes" or "no" checked.

     Do you see that, sir?

A.   Yes, that's correct.

Q.   So was this form not completed properly?

A.   No.

Q.   Why is that?

A.   Because he says -- the question is:  Are you an alien who has been admitted to the United States under a nonimmigrant visa?

     And he said "no."

Q.   Okay.  Does it specifically then -- and that's -- and you are talking about 21.l.1; is that correct?

A.   Correct.

Q.   So does 21.l.2 specifically state -- instruct that U.S. citizens or nationals are to leave 21.l.2 blank?

A.   That's exactly correct, yes.

Q.   And this individual did state that he was a U.S. citizen, correct?

A.   Yes.

Q.   And so was it appropriate, then, to leave 21.l.2 blank?

A.   Yes.

Q.   All right.  So no errors with regard to any -- assuming the information is correct, of course, no obvious errors in question 21?

A.   Correct.  That's correct.

Q.   And then what happens after question 21?

A.   So after you complete this information, as you guys can see later on down in the form, you have to sign and date it, basically certifying that your answers are true and correct and complete.

Q.   And is there actually a warning with regard to signing this form and signing in box 22 if the information is not true and correct and complete?

A.   Yes, that's correct.

Q.   And specifically, what does that -- that bold language warn the buyer or potential buyer, as far as providing any false information?

A.   That it's a crime, a felony, under federal law, and may also violate state and/or local law.

Q.   And does this -- did the -- is there a signature contained in box 22?

A.   There is, yes.

Q.   And can you read what that signature says.

A.   I can't really.  It looks like part of the last name may be "Rojo."  R-o-j-o.

And then, I can't make out the first part of it.

Q.   Okay.  And is there a certification date that is supposed to be filled out by the seller?

A.   Buy the buyer, yes.

Q.   I'm sorry, by the buyer.  Thank you for making that correction.

A.   Yes, there is.

And it's dated May 19th, 2021.

Q.   And is that your understanding of when the -- this form was filled out -- section B of the form was filled out?

A.   Yes, correct.

Q.   Now, does that date, box 23, conclude the portion of the Form 4473 that the buyer fills out?

A.   That's correct, yes.

Q.   Then, going into section 3, starting with box 24.

Who fills out this section of the form?

A.   An employee or someone at the FFL.

Q.   Okay.

A.   Sometimes it's the business owner, sometimes it's someone employed at the FFL.

Q.   Okay.  What is the -- basically the significance of section C?

A.   So there's a variety of information.

As you can see in 24, it wants you to designate whether it's a handgun or a long gun or other firearm.

And then it has more personal identifying information, to include the individual's Arizona driver's license number, and also, too, when that Arizona driver's license, or sometimes ID, expires.

And then if you drop down to 27, you will see -- in 27b, you'll see the NICS number. And that is the number that -- when the FFL completes the background investigation, that is the number that's given to the FFL by the FBI.

And then remember what I talked about earlier, you can get a proceed, or a deny, or a delay. That information is noted in 27c. Like "Charlie."

Q. Okay. And before we get to 27c, so just -- I just want to clarify.

Is all of the information here that we're looking at, section C, is that -- must that be completed by the seller or the employee of the firearms dealer?

A. Yes, that is correct.

Q. Okay. So what is it -- the fact that 26 is filled out, this is information that the seller writes down?

A. That's -- yeah, someone from the FFL would -- would list information in 26.

Q. And where do they get this information from?

A. It could be a variety of ways.

Like you can see in 26c, for example, if -- if I'm in the military, and let's say for example my -- I have a driver's license from the State of North Carolina because perhaps that's where I did basic training, but then I moved to Arizona, I could provide proof that I'm in the military, and -- and then they could continue to -- with the sale of the firearm to me, and they would note that information within 26c.

Q.  Just to clarify, then.

In 26, in this particular form, does that indicate that the dealer got the identifying information -- or checked the ID based on an Arizona driver's license?

A.  That is correct.  And that's in 26a.

Q.  Okay.  And that would be an Arizona driver's license of the person who filled out section B, the person who purports to be the buyer?

A.  Yes, that's correct.

Q.  Okay.  What was the result of the NICS, or background check, in this case?

A.  From what I see in 27c, it was denied.

Q.  And then with that being the case, then is it consistent with the fact that 27d through 28 are not filled out here, because the firearm was not transferred?

A.  Yes, that's correct.

Q.  All right.  Then moving finally to page 3 of Exhibit 8.

Is that also consistent -- the fact that this form was

not -- firearm was not transferred as a result of the denial, is that consistent with items 29 through 32 being kept blank as well?

A. Yes, that is correct.

Q. Okay. And so the section D, if there was an actual transfer of the firearm, would that have been filled out by the buyer?

A. Yes.

Q. So is the fact that this section D was not completed indicative of the fact that the buyer did not acquire the firearm, as a result of the denial?

A. Yes, correct.

Q. And then same with question -- section E, to be completed by the transferor or seller.

Again, is that the gun store?

A. Yes, it is.

Q. And the -- it looks like there is some identifying information here.

A. Yes.

Q. And what does that signify?

A. It signifies the FFL, in this case, Murphy's Gun Shop. Or doing business as, d/b/a, doing business as Murphy's Gun Shop.

It provides all the information of the federal firearms licensee, to include their FFL number, and that's the 9-86 number that you see below the telephone numbers that are

listed.

Q. Okay. And does it give the name of the employee who worked with the buyer and filled out the sections, A, C, and E, of the form?

A. Yeah. And that's in box 34, Patrick Murray.

Q. Again, with box 36 being blank, does that indicate that the firearm was not transferred as a result of the denial?

A. Correct.

Q. Moving to the bottom of the page.

We talked about there are three pages. I see page -- I see it says page 3 of 6.

So are there portions that are missing here?

A. Pages 4, 5, and 6 are instructions, detailed instructions, on how to complete the form.

Q. Okay. And are those, then, for the -- for the -- both the dealer and the potential buyer to consult if they have any questions?

A. That is correct.

Q. Is there anything on pages 4, 5, and 6 that we don't have here that is any -- any information that's filled out, anything that either the buyer or the seller fills out, or is that just pretty much stock information that is on every form?

A. That's exactly right. It's just written instructions on how to properly complete the form.

Q. So is box 36 the last box that could possibly be -- be

completed and contain any specific information from the transaction?

A. Yes, that is correct.

Q. Okay. So I just want to make sure. We're not missing any information that anyone filled out in pages 4 through 6?

A. Correct.

Q. Thank you, sir.

After obtaining this form, did you provide it to the -- some of your colleagues, agents, with the Department of Homeland Security, Homeland Security Investigations, to use in their investigation in this case?

A. Yes, I did.

Q. Did you yourself have any additional involvement or any contact with the defendant in this case?

A. No, I did not.

MS. WOOLRIDGE: Okay. Thank you, sir, then. Those are all the questions I have for you at this time.

THE COURT: Thank you.

Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. Thanks.

CROSS-EXAMINATION

BY MR. WILLIAMS:

Q. Good afternoon, sir.

A. Good afternoon.

Q. So I'd like to begin by asking some questions about this

Form 4473. Correct?

A. Yes, that's correct.

Q. Okay. First of all, I think you testified that you'd handled so many of these, it was hundreds and possibly even a thousand. Is that correct?

A. Many forms, yes.

Q. Okay. So does this form only come in the English language?

A. No, it does not. It also comes in the Spanish language.

Q. Okay. Does it come in any other languages?

A. I don't know. Not that I know of.

Q. Okay. And have you handled the forms in the Spanish language, the 4473?

A. I don't know if I have seen any in Spanish. I know that the form does exist.

I have not seen any in the Spanish language in probably at least the last three to four years.

Q. Okay. You indicated that the FFL, that is the federal firearms licensee, have certain rules to follow; correct?

A. Yes, that is correct.

Q. Okay. Are there any rules set up for the FFL to determine which form they should give to a Hispanic male? English, Spanish. Are there any rules about that?

A. Not that I know of, no. I guess it would be all, you know, based on conversations that -- and interactions with the person that's trying to buy the gun.

Q.   Okay.  So there's no guidance for an FFL as to which form they should give.

A.   ATF makes available to each gun store ATF Form 4473s, both in Spanish and English.

Q.   Is the FFL required to have a Spanish 4473?

A.   I don't know if it's a requirement.  I know that we live in Tucson, Arizona.  So most are good about having it both in English and in Spanish, just because there's a large Hispanic population in Tucson that -- that may, you know, speak Spanish.

Q.   So you are very familiar with this form, correct?

A.   I'm pretty familiar, yes.

Q.   Okay.  And, in fact, if you look at -- do you have page 2 of the form in front of you?

        THE CLERK:  I apologize, Counsel.  I thought we were done with the exhibit.  One moment.

        MR. WILLIAMS:  I want to talk about it a little bit.

        THE CLERK:  Understood.

        Thank you.

BY MR. WILLIAMS:

Q.   If you look at page 2, specifically underneath where it says -- well, it says:  Certify -- I certify that my answers in section B are true, correct, and complete.

    Do you see that sentence, sir?

A.   Yes, I do.

Q.   Okay.  And if you read the very next sentence -- I mean,

could you just read that for the record.

A.  Yeah.  The one that says "I understand"?

Q.  Oh, no.

A.  Or "I have read" --

Q.  That one.

A.  -- "and understand the notices, instructions and definitions on ATF Form 4473."

Q.  Okay.  Now, I want to go forward a little bit and then come back to this.

This form that has been received into evidence.  Exhibit 8 I think it was.  Did you personally make a copy of the original?

A.  I personally did not make a copy.

I was at the gun store with Homeland Security Investigations Special Agent Tony Tran, and I believe it was made by an employee of the FFL.

Q.  Okay.

A.  But I was there when we obtained the form.

Q.  Okay.  So did you ever actually observe the original?

A.  I -- I don't recall.  I'm sorry.

Q.  Okay.  So all you can say is that this appears to be a copy of the original?

A.  Correct.

Q.  Okay.  And you would agree that this form has -- if you look at the bottom, it says 1 of 6, 2 of 6, 3 of 6.  Correct?

A. Correct.

Q. Okay. I'll just show it just for the jury.

Well, so if we can look at page 1. It says 1 of 6, and, tell me if I'm right, the next page 2 of 6, and then the next page 3 of 6.

And there's no pages 4, 5, or 6. Is that right?

A. That's correct.

Q. Okay. So --

A. When we obtain these forms from the federal firearms licensees, we typically don't get pages 4, 5, and 6 because we're more interested in the information that is completed by both the buyer and the seller.

Q. Okay. But being the honest witness that you are, pages 4, 5, and 6 do contain definitions. Correct?

A. Yes.

Q. Okay. And, in fact, if you had page 4 in front of you, it actually gives a definition for the reader of what is an actual transferee and what is an actual buyer. Is that fair to say?

A. I believe I would want to look at it.

Q. Okay. Do you happen to have a copy of the complete form in front of you?

A. I do not, no.

Q. So would you agree that if you look at page 2, where it -- the sentence that you read, it says: I have read and understand the notices, instructions and definitions on ATF

Form 4473.

And those instructions and notices and all that, it starts at the bottom of page 3. Isn't that correct?

I am showing you looking at page 3.

A. Yes, that is correct.

Q. Okay. But it doesn't -- that's not the complete notices, instructions and definitions. Is it?

A. No. It continues with the additional pages.

Q. Okay. And so you don't know if the complete notices, instructions and definitions, going -- including pages 4, 5, and 6, were ever presented to the person that actually signed this document.

A. So the 4473, when the FFL provides it to them, all the pages are connected in like a perforated type thing.

Each gun store does it slightly different, but when they're -- when the FFL provides a packet, it includes all the pages to the individual that's buying the gun.

Q. Yeah. But this case, I mean, because you weren't there, you cannot honestly say that the person who gave this form to the person who completed it actually showed them pages 4, 5, and 6. I mean, you don't know that.

A. I don't know that.

Q. Okay. And those definitions of what is an actual buyer and, you know, what is a felony, those definitions apply not only to the FFL but the person that is required to read it so

they can understand an honest -- and give an honest answer.
Correct?

A.   Correct.

Q.   So the notices, instructions and definitions serve a dual purpose.  One is to -- for the FFL to read it and understand it, and also for the person that's attempting to purchase a weapon so they can understand the questions.  Right?

A.   Yeah.  There's instructions -- just like we went through the form and there's portions for the FFL to complete, there's portions for the buyer to complete, just -- so those instructions on pages 4, 5, and 6 would apply to both the FFL and to the buyer.

Q.   And, in fact, part of those definitions and instructions, they even give examples.  Don't they?

A.   They do.

Q.   Okay.  But you don't see that in this -- in what you have before you.  Correct?

A.   Correct.

Q.   Okay.  And correct me if I'm wrong, but don't the definitions and instructions and the notices discuss each question that the person is supposed to answer?

A.   Yes.

Q.   Okay.  And forgive me for asking again, but didn't you say that you agreed that they define what is an actual buyer and transferee?

A. Again, I would want to see -- I think it was page 4 that you referred to, I would want to see that.

Q. Well, I mean, do you agree that's on one of the pages, 4, 5, or 6. Right?

A. Yeah. I don't know what the exact wording is, but I'm sure it talks about it.

Q. Okay. And it defines what is a mentally defective person, mental institutions, things of that sort. Correct?

A. Yeah. It's -- I think the instructions are pretty thorough.

Q. Okay. And it talks about crimes of domestic violence, restraining orders. Correct?

A. Yes.

Q. Now, you did not see who completed this form. Correct?

A. I was not there when it was completed, no.

Q. Okay. Then with respect to page 1, it looks like it has, on question number 6 -- correct me if I'm wrong, doesn't it have "one" spelled out and then a line through it, and then zero?

A. Yes, that's correct.

Q. Okay. But because you weren't there, you don't have any information as to why that was done. Correct?

A. Yes, sir, that's correct.

MR. WILLIAMS: If I could just have a moment, Your Honor.

BY MR. WILLIAMS:

Q.   Must the FFL store keep records regarding if they have the Spanish form?

Are they required to keep any records like that?  The FFL keeping the Spanish 4473?

A.   Yeah.  So, you know, they're required to keep all 4473s that are completed.  So if one was completed on a Spanish version of the 4473, they would have to hold onto that.

Q.   But I mean, are they required to keep a record that they actually have the Spanish form on hand just in case it's needed?

A.   Like are they -- are they required to post?

Q.   No.  Are they required to keep records like, okay, I'm FFL whatever, and I have Spanish 4473s on hand?

Are they supposed to keep records if they have that form there?

A.   I don't know.

Q.   Okay.

A.   I don't know.

And just -- just to clarify, too, so within ATF you have two different sides of the house.  You have civilian employees that do the inspections of the gun stores and make sure that the record -- recordkeeping is correct, and then, on the criminal enforcement side of the house, where -- where we investigate, you know, violations of federal law.

Q.  Thank you, sir.

MR. WILLIAMS:  I don't have any other questions, Your Honor.

THE COURT:  Thank you.

Any redirect?

MS. WOOLRIDGE:  Very briefly, Your Honor.

Thank you.

REDIRECT EXAMINATION

BY MS. WOOLRIDGE:

Q.  Special Agent Brandt, I just have just a few minutes, if that, to follow up with you.

You mentioned, I believe, that the Spanish Form 4473 is, in fact, provided by ATF to all gun stores, regardless of where they are located.  Correct?

A.  Yes.  And you can even go online and get copies of the form.

Q.  I guess now I don't have to ask my next question.

But the Spanish and English versions are both available online?

A.  Yes.

Q.  Would that be to anyone?

Could I go online right now and find it?

A.  I'm sure you could.  Yes.

Q.  Okay.  Could any -- for instance, if an FFL ran out of either version of the form, English or Spanish, could they

find it online and download it online?

A. Yes.

Q. And you mentioned that in Tucson, Arizona -- I just want to make sure -- I'm not sure if I understood this correctly or heard it correctly -- that you are familiar with gun stores in the Tucson area, given our population here, of having that form and providing it to customers. Correct?

A. Yes.

Q. And does the customer have that option?

Can someone that is just a Spanish speaker, or primarily Spanish speaker, fill out the Spanish form without being required to fill out the English form?

A. Yes, that's correct.

Q. Does it have any effect on their ability to purchase the firearm or legitimacy of the firearm purchase?

A. Does not have any effect.

Q. And is it routine that just for your own records, you don't keep the page -- the pages 4 through 6 of the form as a result of -- basically, again, you mentioned that you are more interested in the information that's filled out by the buyer and the seller. Correct?

A. That is correct, yes.

Q. And with the Spanish version, does the Spanish version also have the definitions and instructions, pages 4 through 6, in Spanish, rather than in English, should someone want to consult

those definitions in Spanish?

A.   Yes, that is correct.

Q.   All right.  Thank you, sir.

          MS. WOOLRIDGE:  That's all I have.

          THE COURT:  Sir, the rule of exclusion has been invoked, which means you are not to discuss your testimony with other witnesses, you may not be present in the courtroom while other witnesses are testifying, and you may not be present while witnesses are discussing their testimony.

          But you are excused.  Thank you.

          THE WITNESS:  Thank you.

          THE COURT:  You may call your next witness.

          MS. WOOLRIDGE:  Thank you, Your Honor.

          The government calls Patrick Murray of Murphy's Guns & Gunsmithing.

          **PATRICK MURRAY**, WITNESS, SWORN

          THE CLERK:  You may be seated.  And there is water there, if you'd like.

          THE WITNESS:  Perfect.  Thank you.

          THE CLERK:  And would you state your full name for the record, and spell your last name.

          THE WITNESS:  That would be Patrick Michael Murray.  Last name is spelled M-u-r-r-a-y.

          THE COURT:  You may continue.

MS. WOOLRIDGE:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. WOOLRIDGE:

Q.  Good afternoon, sir.  I'm Assistant U.S. Attorney Angela Woolridge.  We've all heard your name.

Could you explain to the jury how you are employed?

What is your occupation?

A.  I am a manager at a gun shop here local to Tucson.

Q.  And what's the name of that gun shop?

A.  That would be Murphy's Guns & Gunsmithing.

Q.  And do you have any sort of, I guess, familial relationship with regard to Murphy's Guns & Gunsmithing?

A.  Yeah.  It's a family-owned business, so...

Q.  Okay.  How long have you worked there?

A.  Close to 15 years.

Q.  So having worked there for 15 years, this being a family business, are you -- do you consider yourself kind of familiar with the inner workings of the business?

A.  Yes.  100 percent.

Q.  And with regard to your job there, do you have a specific role?

Are you kind of a jack-of-all-trades, or do you have a specific role that you do?

A.  I would be considered one of the managers.  Or the manager, I suppose.

Q.   And have you always been a manager, or did you start something else and kind of --

A.   Yes.   I obviously started with sales and became a manager after being there for a decade.   So I've been a manager or in a managerial role for about five years now.

Q.   Even before you became a manager, just as an employee, were there certain rules and regulations that you had to abide by, or could you just do whatever you wanted?

A.   No, there's definitely rules.

Q.   And when you say "definitely rules," can you explain to a -- to a jury -- for those of us that -- that don't know kind of what the -- what rules the -- what rules gun stores may have to operate under.

A.   We have to follow all the rules given to us by the ATF, which is -- the old book that they used to give us was about this thick (demonstrating) of just rules for running the shop and making sure that we were in compliance with the ATF and everything we did was legal.

Q.   And when you -- just for the record, I saw you holding up your fingers.

A.   An inch, maybe inch and a half thick.   I mean, like 3- or 400 pages.

Q.   And when you say "the old rules," do those rules no longer apply?

A.   No.   They've moved to a digital form because there's more

than there used to be, so...

Q.   Okay.   So safe to say even more than -- than an inch or couple inches thick, but just now online?

A.   Yes.   Exactly.

Q.   As an employee of Murphy's Guns & Gunsmithing, are you required to be familiar with those rules?

A.   A hundred percent.

Q.   And when you say, "a hundred percent," are there any consequences if you are not familiar or if you don't abide by them?

A.   Yeah.   We could lose our license as an FFL holder.

Q.   All right.   Has Murphy's Guns & Gunsmithing ever lost their license?

A.   No.   Never.

Q.   Has it continuously been in business so long it's been with your family?

A.   Yeah, since 1979.

Q.   And do you regularly have to undergo, I guess, inspections, visitation --

A.   Yeah.   We get audits every three years, without fail.

Q.   And I'm sorry, only -- there is -- just because our friend Tracy here is taking down every word that I say and what you say, I just want to make sure we don't make her life difficult by talking -- by talking --

A.   Fair.

Q. Exactly.

So is it -- is it the ATF that enforces those rules and conducts the inspections to make sure that you comply?

A. Yes, it is.

Q. Do any of those rules apply to the interactions that you have with customers?

A. Yeah, most of them. And how they purchase a firearm and how we sell firearms.

Q. Can you just take the jury through kind of the -- the steps and the general rules just, I guess, if you are -- if you are explaining to someone that's never been into a gun store and bought a firearm, what -- how -- what kind of regulations are there where let's say I walk into your store and I come -- I come up to you and say, I want to buy a gun.

A. You have to have a valid Arizona driver's license to even purchase a firearm.

And once we get that driver's license, we try and find the gun that would work for you and what you are looking for.

Once we determine that a gun is or is not for you, we have to do a thing called a 4473, which is the paperwork that everyone fills out to purchase a firearm.

On that form, you have to read through -- I believe it's nine different questions based on -- or you start at number 9 and go to 21, which will be, you know, last name, first name, middle name, your current street address, city, state, zip, and

county, the city and state you were born, or the country you were born in, your height, weight, gender, date of birth, a Social, a UPIN, country of citizenship, and if you have an A-number or anything like that.

And then you go on to a section that is lettered "a" through "k," which will ask you questions on if you are eligible to buy a firearm or not.

Q. Okay. And, sir, if you don't mind, in a little -- in a few minutes, I'm going to take you through one of these forms and have you kind of just -- so we can visualize it and see it, and you can explain it to the jury.

But before we even do that, I want to talk a little bit about -- just about -- generally about this form.

Are you required to keep every form that's filled out in your records as a firearms business for the ATF?

A. Yes.

Q. Are there penalties, possible consequences, if you don't keep those forms?

A. Yes.

Q. Now, when you provide the -- basically if a customer comes into your store, do you provide them that form?

A. We do.

Q. Do you have -- keep copies of it in your store?

A. Yeah. Definitely.

Q. Is this form in the English language?

A.   It is.

Q.   Is there also another copy of this form in a different language?

A.   Yeah.   There is one -- if requested, we could give them one in Spanish.

Q.   So your store has the ability to give a customer a form in Spanish if they don't speak English?

A.   If they request it.

Q.   Okay.   And would -- what do you -- what language do you -- or languages do you yourself speak?

A.   I speak English only.

Q.   Only?

A.   Only.

Q.   Okay.   What -- what would happen if you are interacting with a customer and they only speak Spanish and you can't understand them?

Has that ever happened?

A.   That has, and most of the time we have someone who works for us that speaks Spanish as a second language.

Q.   Would that person then provide the Spanish copy of the form?

A.   Only if requested.

Q.   Okay.   And would you ever sell a firearm to a customer that you were not able to converse with?

A.   No.

Q.   Why -- why not?

A.   How could they understand the form?

If we have a language barrier, they could not -- if we could not speak the same language, how could we know for sure who it was for?

Q.   When you say "who was it was for" -- is that correct?

A.   Who it's for, what they need it for.  It's hard to figure out what someone wants if we can't come to an agreement on the sale.

Q.   So have you ever sold or attempted to sell -- or I shouldn't say -- have you ever sold or filled out the 4473 with a customer who you weren't sure you were able to converse with and understand?

A.   Myself, I would say there is a possibility.  But more often than not, no.

Q.   If you felt that you couldn't converse with them, would you have done that?

A.   No.

Q.   Okay.  And so if you filled out a form -- had an interaction with a customer and filled out your portions of the form with the customer, do you feel confident that you could converse and communicate with that customer?

A.   Yes.

Q.   Okay.  Have you had an opportunity to fill out Form -- I'm sorry -- to review a Form 4473 in relation to coming to court

here today?

A.   Have I looked at one this morning, no.

Q.   Okay.  Have you in the past had -- either spoke with any agents or talked about a form in -- related to the case for which we are in trial here for today?

A.   Yes.  I have looked at a form in regards to this case, yeah.

Q.   Okay.  I'm going to show you what has been marked and previously admitted as Exhibit 8.

     First of all, I'm going to ask if you see an image on your screen there.

A.   I do.

Q.   If you can just take a moment to take -- to look over this document, at least the first page, and tell us just from the first page, do you recognize that document?

A.   Without a doubt.

Q.   Is that the form that you reviewed in connection with coming to court here today?

A.   Yes, it is.

Q.   Now, when you reviewed this form, did it refresh your recollection as to an encounter that you had with an individual?

A.   Yes.

Q.   Do you recall when that encounter took place?

A.   May of last year.

Q. So May of 2021?

A. I believe so, yeah.

Q. Do you have independent recollection at all of that encounter?

A. I do.

Q. Okay. And how many customers would you say that you come into contact with, just estimate, on a regular basis?

A. Daily? Weekly? What are you -- daily?

Q. Sure. Let's just say daily, if that's easiest.

A. In the sense of filling out a form with them?

Q. Correct.

A. I suppose for me personally, it could be anywhere between five and 20 people. And I check up to 30 or 40 forms a day, so...

Q. And is checking forms part of your job as a manager also then?

A. It is, yeah.

Q. And you -- if I'm doing my math correctly, you were a manager then back in May of 2021 as well?

A. Guaranteed.

Q. Do you take your responsibilities on -- both filling out this form and reviewing forms filled out by other employees in the course of your role as manager, do you take that role seriously?

A. Very seriously.

Q.  Why very seriously?

A.  Because if we make a mistake on a form, that could lead to a citation from ATF, and that could potentially cause us to lose our business.

Q.  So are you yourself -- do you consider yourself to be diligent when you fill out these forms?

A.  Yes.

Q.  Do you always follow the instruction on the -- instructions on the forms, or do you ever -- is there any kind of gray area?

A.  No.  There is no gray area on the form.

Q.  Do you always follow the instructions word-for-word?

A.  In the sense of 21a through k?  Or throughout the whole form, do I follow what it says and say it specifically as it is?

Q.  I guess my question is, like, for instance, I see, you know, section A must be completed by transferor -- transferor or seller.

I'm guessing that's you or the gun store.  Correct?

A.  Section A, yeah.  That is always going to be us.

Q.  Okay.  So do you follow that on to a T, or do you ever have the buyer fill out that information?

A.  Never.  They never fill that out.  It's always me.

Q.  Okay.  And then kind of moving onto section B, it says: Must be completed personally by transferee or buyer.

Do you ever fill that information out as a seller?

A.   Never.

Q.   Okay.  And why -- why are you so -- why do you say never?  Are you certain that you never have?

A.   Certain because that could be -- lead to another citation that we could lose our business.

Q.   Okay.  And just generally talking about the Form 4473, how many pages is it?

A.   Well, there's three pages that have stuff on it and the other pages will be instructions, so...

Q.   Do you ever separate the instructions from the three pages --

A.   Never.  Sorry.

Q.   That's okay.

     Do you ever separate the pages with the instructions from the three pages that have the boxes to be filled out?

A.   Never.

Q.   And why -- why never?

A.   It's a form that's, I guess, pressed together, so it -- it doesn't come apart.

     I mean, you could tear the pages off and -- if you wanted to, they are perforated, but we do not separate them at all.

Q.   Okay.  Do you recall ever -- ever providing a customer with just the first three pages or just a portion of the form?

A.   No.

Q.   You mentioned you had some independent recollection of this

transaction.

Can you describe to us what you recall from this transaction in May of 2021?

A. The gentleman here, he came in with another female, and they were looking for a gun. And while they were doing that, he was the one doing most of the talking because she could not speak English, or so stated.

Q. And, sir, I'm going to -- so I'm going to ask you some follow-up questions before we go too far.

A. Okay.

Q. You mentioned a male -- "the male here."

Do you see that individual in the courtroom here today?

A. Yes.

Q. Can you describe where he is sitting? And perhaps maybe an article of clothing, so we know who you are talking to.

A. Yes. The gentleman behind you with the gray shirt.

MS. WOOLRIDGE: Your Honor, may the record reflect that the witness identified the defendant?

THE COURT: The record will so reflect.

BY MS. WOOLRIDGE:

Q. And so you mentioned he came in with a female as well, correct?

A. Correct.

Q. And you said that the male was doing all or most of the talking because the female did not speak English.

A.   Correct.

Q.   Did the male speak English?

A.   He did.

Q.   Did he speak English with you?

A.   He did.

Q.   You were able to converse freely with him?

A.   Yes.

Q.   Did you ever feel like you -- there was any sort of language barrier, that he didn't understand you?

A.   Not at the beginning, no.

Q.   Okay.  And how about the female, what language did she speak?

A.   Spanish.

Q.   Do you recall the defendant ever saying -- do you recall anything specifically that he said to you when he first came into your store?

A.   Well, he was looking for the firearm for her.  He had mentioned it would be great for their ranch.  And so at that point, I thought the firearm was indeed for him and not for her.

Q.   Okay.  And did he -- was he speaking with you directly, or did she ever speak with you directly?

A.   She never spoke with me directly.

Q.   Did he pick out a certain firearm that he was interested in?

A. Yes.

Q. And did he say this is -- do you recall how that happened that he picked out a firearm?

A. Not exactly, no.

Q. Okay. Did -- I mean, did he -- was it something where he asked you a bunch of questions and you recommended "I think you'll like this," or did he kind of already have in mind something he was interested in?

A. If I remember correctly, he was looking at smaller firearms. So we went through the bestselling guns in that area, and he selected one from it.

Q. He selected one?

A. I believe so, yes.

Q. Okay. Was he the primary person having that interaction and discussing the firearm, as opposed to the female?

A. Yes.

Q. Did he actually handle the firearm that he ultimately selected?

A. Yes.

Q. Do you recall him kind of looking at it, you know, manipulating it, checking it out?

A. Yes.

Q. Did he appear to be -- I guess more or less have an understanding of firearms?

A. Yes.

MR. WILLIAMS:  Objection.  Calls for speculation.

THE COURT:  Sustained.  And leading.

BY MS. WOOLRIDGE:

Q.  Have you ever had interactions with customers that you got the impression had never handled a firearm before?

A.  Yeah.

Q.  Okay.  And in this particular case, when you saw the defendant manipulate the firearm and when he spoke with you about the firearm, did you have -- did you get the impression at all that he was completely unfamiliar with firearms or that he at least -- he had some understanding about how the firearm worked?

MR. WILLIAMS:  Objection.  Leading.  Foundation.  Compound.

THE COURT:  Overruled.

You may answer.

THE WITNESS:  So I can answer the question?

THE COURT:  Yes.  You may answer.

THE WITNESS:  Okay.  He seemed to understand the firearm and how it works, without a doubt.

BY MS. WOOLRIDGE:

Q.  So then what happened after he had selected a firearm and had handled it?

A.  He tried to give it to the female to fill out the paperwork on it.

Q. And did that kind of bother you or kind of pose a red flag for you?

A. A red flag, yeah.

Q. Why is that?

A. Because that's a straw purchase, which is against the law.

Q. Can you explain to the jury what you mean by the term "straw purchase"?

A. When a person tries to buy a firearm and it is not for them, they are committing a straw purchase, which in some cases -- or in all cases they would be breaking the law. And if we went through with that sale, we also would be breaking the law. It's punishable up to, what, 10 years in prison and $250,000. So, pretty serious in our opinion.

Q. Okay. In this particular case, what caused you concern that the defendant -- that a straw purchase may be -- may have been attempted here?

A. Because he had said it was for his ranch.

Q. Okay. And so did you -- did you kind of explain that to him, or did you have a discussion with him about that problem?

A. Yeah. We talked about how since he was the one who selected the firearm, he would be the one doing the form.

Q. Did he agree to do that?

A. Yes, he did.

Q. Did he ever say, "no, no, no, my mistake, it's her firearm," or anything like that?

A.  He tried to say she was the one buying it, but he did select the firearm himself.  So it is for him.

Q.  And did he agree then -- when you explained that to him that the actual purchaser has to be the one to fill out the form, did he agree to fill out the form?

A.  He did fill out the form, yes.

Q.  Is this a copy of that form that we're looking at in front of us as Exhibit 8?

A.  Yes, it is.

Q.  I'm going to zoom in a little bit.

We've already heard a little bit about this form, but I want to go over -- go over it with you particularly.

Did you fill out portions of this form?

A.  Yeah.  I filled out section -- or 1 through 6, essentially.

Q.  Okay.  So section A?

A.  Yeah.

Q.  And do you recognize your handwriting in section A?

A.  Yes.

Q.  Are you certain that you are the person that filled out the boxes that are completed in section A?

A.  Yes.

Q.  And can you just explain to the jury what -- what type of information you put in there?

A.  This will be the manufacturer, the model, the serial number, the type of firearm, and the caliber.  And then total

numbers of firearms transferred to the individual.

Q. Why -- under the total number of firearms, box 6, why does it say "one" and then "one" is crossed out and it says "zero?"

A. Because no firearm was transferred.

Q. So was "one" the firearm that the defendant attempted to purchase, and "zero" was the number of firearms that ultimately were transferred?

A. Correct.

Q. Okay. Did you yourself then cross out the one and write in zero after no firearm was transferred?

A. Yes, I did.

Q. And is the description of the firearm, a Smith & Wesson, M&P 380 Shield EZ, .380 caliber pistol, with serial number REA9003?

Is that the firearm the defendant picked out?

A. Yes.

Q. Okay. Then moving onto section B.

Who filled out section B?

A. Efren Rojo, I suppose it would be. The gentleman there.

Q. You say: The gentleman there.

Is that the same individual you identified before that we stated for the record was the defendant in this case?

A. Yes.

Q. Okay. Are you certain that he filled this out?

A. Yes.

Q. Did you witness him fill this out?

A. Yes.

Q. Did you fill out any portion of this for him?

A. No.

Q. Did you assist him with filling out any portion of this?

A. No.

Q. Do you recall him asking any questions or having any difficulty or expressing any difficulty filling out section B of this form?

A. I cannot remember exactly on that.

Q. Okay. Did anything stick out in your mind as him having any difficulty?

A. If someone who -- doesn't understand the form, if they're like, "are you the actual transferee/buyer of the firearm listed on this form," or any continuation sheets, we will say it out loud to them. For some reason hearing it helps people understand it. But I do not recall if I read it out loud to him word-for-word or not.

Q. Okay. Did anything about this transaction, and when the defendant filled out section B, ever cause you concern that he did not understand what he was filling out?

A. No.

Q. Looking on the form, is there anything, I guess, problematic about the information?

Let me first say, the boxes that were added, were added

after you filled out the form.  Correct?

A.  Right.

Q.  Those black rectangles?

A.  That is correct.

Q.  In the form that you kept in your records, had the defendant filled out the month, day of his date of birth, as well as his Social Security number?

A.  The social is optional, so I'm not sure without looking at the original form.  But for month and day, yes.

If there was something there and they were trying to cover it, then he could have put the social.  But it is not required to be there.

Q.  Okay.  But the month and day are required.

A.  Yes, without a doubt.

Q.  And did you verify that in the -- with the driver's license?

A.  Yes.

Q.  Okay.  And anything else -- you know, anything -- have you ever had, for instance, a customer that either accidentally or for whatever reason made a mistake filling out the form?

A.  Yes, definitely.

Q.  What happens then?

MR. WILLIAMS:  Objection.  Relevance.

THE COURT:  Sustained.

BY MS. WOOLRIDGE:

Q.  Do you see anything in here that -- just anything odd about any of the questions that were -- that are answered?

A.  Everything's filled out the way it should be for us to run the form.

Q.  Okay.  I think you mentioned a UPIN number, and we were talking about one of the previous witnesses about box 17.

What is a UPIN?

A.  It is a unique number given to people if they do get a deny, or already have a unique number so that they can run a background check.

Q.  Okay.  And so is that something -- I guess I'm just concerned because I see that question 17 is blank.

Is that unusual or does that mean the form is incomplete?

A.  No.  It does say on the form, "if applicable," which I would venture to say more than 90 percent of people will never have one of those.

Q.  Okay.  Question number 20 is also blank.

Is that -- does that mean that it's incomplete or something problematic there?

A.  No.

Q.  Okay.  Why not?

Why is it okay that that's left blank?

A.  Because this would only apply to you if you were from another country --

Q.  Okay.

A.   -- and had a resident alien card or A-number.

Q.   Okay.  Did this individual indicate he was not an alien, he was, in fact, a U.S. citizen, in question 19?

A.   He did say he was a U.S. citizen.

Q.   Okay.  So with that, is it -- does it make sense that question 20 is left blank?

A.   Correct.

Q.   I want to talk about question 21, and specifically question 21a.

Is that -- as an FFL employer or manager, is that an important question to you?

A.   Yes, very.

Q.   Why is it very important?

A.   Because it asks if you are the actual transferee/buyer of the firearm listed on this form.

If they answer "no," they have disqualified themself from buying the firearm.

Q.   So are you -- if someone were to check "no" to that box, could you lawfully sell the firearm to them?

A.   No.

Q.   Is that what you referred to earlier as a straw purchase?

A.   Correct, yes.

Q.   Well, but it's the customer that's filling out 21a, correct?

A.   Yes.

Q. So do you have to rely on their truthful answer to this question, then, in knowing whether or not the straw -- whether or not they're an actual buyer versus a straw purchaser?

A. Yeah. We obviously don't know their background or their history, or who the firearm's for. If we try to sell them the gun and they answer "yes," we have to take them at their word on that.

Q. And what about the remainder of question 21, what's the significance of those questions?

A. If any of those questions are answered "yes," it also disqualifies them from purchasing a firearm.

Q. Okay. In question 21c, how did the defendant answer when asked: Have you ever been convicted in any court, including a military court, of a felony?

A. He answered "no."

Q. And again, did he check all of these boxes or did you check any of them for him?

A. I did not check any of them.

Q. When he checked out these boxes, were the pages 4 through 6 attached to this form?

A. Yes.

Q. Moving on to the second -- top of the second page of Exhibit 8.

Are questions f through l also questions that apply to whether someone else is able to possess a firearm? Or acquire

a firearm, I should say.

A. Yes.

Q. And if the person indicated yes to any of those, would that also possibly prohibit them from purchasing a firearm?

A. Yes.

Q. Did the defendant check "no" to all these boxes?

A. He did.

Q. Now, again, I see another blank here. 21.1.2.

Is that problematic that that question was left blank?

A. No. And it would -- it's rarely answered, unless you answer: Are you an alien who's been admitted to the United States under a nonimmigrant visa? And then: If you are such an alien, do you fall within any of the exemptions stated in the instructions, which would be attached to the form.

Q. Okay. And so because this person claimed that they were a U.S. citizen, was that correct, then, that 21.1.2 is kept blank?

A. Correct.

Q. Now, I see a section after question 21 in bold.

What's the significance of this bold language?

A. It states that they are lawfully and honestly answering all the questions in this form.

Q. Okay. Did the person then sign this form?

A. He did.

Q. Did you witness him signing the form?

A.  I did.

Q.  And did that person also write in the date?

A.  He did.

Q.  Is this the correct date that the transaction occurred on?

A.  It is.

Q.  Moving on to section C.

Did you fill out that information?

A.  I did.

Q.  And are -- do you recognize that to be your handwriting?

A.  It is.

Q.  Did you verify this individual's identity with any sort of identification?

A.  With his Arizona driver's license.

Q.  And how did you do that?

A.  We have to have a physical, hard copy of his driver's license.  And we go through all the information on the front of the form.  If it matches we'll put the AZ DL down, their driver's license number, and the day it expires.

Q.  Okay.  So the fact that the -- that you wrote down the driver's license number and expiration date, does that mean that you verified that all of the biographical information on this -- the defendant's driver's license matched the information he provided in section B?

A.  Yes.

Q.  And did he give you his driver's license?

A. He did.

Q. Did you ask him for it?

A. Of course, yes.

Q. In English?

A. Yes.

Q. Okay. Any -- any problems with that communication?

A. No.

Q. And so then what happens after you verified the identity?

A. Once we verify the identity, we log in to the NICS operations center. They have a website called LEEP login, which is the NICS operation center where we run the background checks. We have to type in all the information on this form, and then wait for a response from them.

Q. Okay. And what is NICS? We've -- I think we've heard that acronym a few times now.

A. Hmm. The National Criminal Investigation something, maybe. I'm not sure, sadly.

Q. Okay. Is that essentially the -- kind of an acronym for the background check system?

A. It is.

Q. Okay. And so you provide the information to them and they tell you whether or not someone, I guess, passes?

A. That is correct.

Q. What happened in this particular case?

A. He was denied.

Q.  And what does that mean to you as an FFL employee?

A.  He cannot take possession of the firearm, and we cannot transfer it.

Q.  So then did you refuse to transfer the firearm?

A.  Yes.

Q.  Do you recall what happened once you had told him about that?

A.  We would have given him -- given him a slip with this NTN number on this form, showing him that he was denied, and he at that point left.

Q.  Okay.  Do you -- and let's see.

Do you recall anything else about the interaction at that time?

A.  He was outside, I think, at the time when we came back in, and we had to wait for him to come back in the building to give him that form.

Q.  Okay.  Let's see.

And just looking at the last page of Exhibit 3 here. Looking at box 33.

Is that basically the information for your -- your family store, Murphy's Guns?

A.  Yes, it is.

Q.  Is that your printed name and signature in boxes 34 and 35, respectively?

A.  It is.

Q.   Did you also prepare a receipt in this particular case?

A.   I would have, yes.

Q.   And I'm going to show you what's been marked but not yet admitted as Government's Exhibit 9.

        MS. WOOLRIDGE:  If we can get the screen for the witness, please.

BY MS. WOOLRIDGE:

Q.   Do you recognize this document?

A.   Yes.

Q.   And what do you recognize it to be?

A.   That's our receipts that we write -- hand write for every firearm we sell.

Q.   Do you recognize this as the one that you filled out in connection with the attempted purchase in this case on May 19th?

A.   Yes.

Q.   And does it -- is this something that you would normally keep, then, in the course of Murphy's Guns & Gunsmithing's official business?

A.   Yes.

Q.   Was it, in fact, kept in your records?

A.   It was.

        MS. WOOLRIDGE:  Move to admit and publish Exhibit 9 please.

        THE COURT:  Any objection?

MR. WILLIAMS:  Yes, Your Honor.  Relevance.

THE COURT:  Overruled.

Exhibit 9 is admitted.

BY MS. WOOLRIDGE:

Q.  And, sir, in this case the gun was ultimately not sold or transferred.  Correct?

A.  Correct.

Q.  So why is it that you filled out this receipt?

A.  We fill it out as they are purchasing the firearm.

Q.  And so basically as -- as this individual was, I guess, expressing interest in the firearm, is that when you are filling this out or when they're filling out the form?

A.  When they're filling out the 4473, as they're filling it out.  We always want to have a record of what we're selling and something for them as well, so it shows what gun they bought, what store number is on it, and our inventory number.

As our standard operating procedures, we require every one of our employees, and including myself, fill this out before we run the background check.

Q.  Okay.  So is this information that you include as far as the -- the individual's name, address, driver's license, all information that you got from him, the defendant in this case?

A.  Yes, it is.

Q.  Does it reflect the weapon that he was interested and tried to purchase, as well as the price?

A. Yes, it does.

Q. I don't recall seeing a phone number on the Form 4473.

Is that the defendant's phone number?

A. On the top here, it would be his phone number.

MR. WILLIAMS: Objection. Relevance. Foundation.

I'll -- I'll withdraw relevance, but foundation.

THE COURT: Sustained.

BY MS. WOOLRIDGE:

Q. How did you get that information?

A. I would have asked him for it.

Q. And again, that would have been in English?

A. It would have been in English for sure.

Q. So he provided -- he told you these numbers when you asked him: What is your phone number?

A. Yes.

Q. Okay. And did you write down, then, the -- the phone number he gave you?

A. Yes.

Q. Sir, does your business have surveillance?

A. We do.

Q. Do you have surveillance outside of the store, or inside of the store, or both?

A. Both.

Q. Okay. I am going to --

MS. WOOLRIDGE: Sandy, I'm going to need to switch

over to the laptop.

I'm almost wondering if -- I know it's a little bit early, but we may need some technical assistance to do so.

THE CLERK: Does have -- are you going to admit it so everybody can see it?

MS. WOOLRIDGE: Correct, yes.

THE CLERK: Okay. Do you know if you are HDMI or VGA?

MS. WOOLRIDGE: I think HDMI.

THE CLERK: Okay. Shall we try it?

You are going to use it from your table?

MS. WOOLRIDGE: Unless --

THE CLERK: No. That's fine.

(Pause while technical issues are discussed.)

MS. WOOLRIDGE: Ah, there we go.

THE CLERK: All right. Are you going to move?

MS. WOOLRIDGE: I am. I didn't -- let me pause.

THE COURT: Ladies and gentlemen, let's take our evening recess at this time.

I know it's been a long day for you, and you've been very attentive, coming here so early this morning.

We will see you at 9:30 tomorrow.

Please remember the admonition. Do not talk about the case. Wear your juror badges whenever you are in the downtown area. The lawyers have been instructed not to have any contact with you, and so if you see them turn away when you are coming,

it's not that they're being rude, they're just trying to avoid all contact. And I am instructing you the same way, you are to have no contact with the lawyers or the parties in this case.

Have a very good evening. Don't think about the case. We'll hear more testimony tomorrow, and I'll see you tomorrow at 9:30.

Have a good evening.

You may step down, sir.

Mr. Murray, hold on for just a second.

(Jury out.)

THE COURT: Mr. Murray, the rule of exclusion has been invoked, which means are you not to discuss your testimony while other people are present, and you may not be in the courtroom while other people are testifying.

But you are excused for the evening. We'll see you tomorrow morning at 9:30.

THE WITNESS: Perfect.

THE COURT: Counsel, I'm going to -- I think it's a good time to take up the motions in limine before we go any further.

You may be seated.

MR. WILLIAMS: Your Honor, can I take a quick bathroom break, just like one minute?

THE COURT: Yes, you may.

(Recess taken from 4:23 p.m. to 4:26 p.m.)

THE COURT: So we're back on the record.

Let me -- let's -- let me just go through some of the motions in limine pretty quickly. If there's an issue let me know.

But anyway, there is the motion -- defendant's motion in limine to preclude conduct, and that was regarding vouching.

I don't believe there is any objection from the defense as to -- from the government, excuse me, as to that motion. Is that correct?

MS. WOOLRIDGE: Well, Your Honor, the concern is that it said not to -- I definitely don't plan to call the defendant a criminal, but certainly -- and they've already heard that he is a convicted felon and that he's committed crimes in this case.

So while I don't intend to say, you know, or have witnesses testify that call him a criminal, I am a little bit concerned of how -- I don't know. I guess how far this is going to be taken. Because, obviously, part of the case is that he is a convicted felon and made false statements about that in the course --

THE COURT: I don't think that -- and you can correct me if I'm wrong, Mr. Williams, but I don't think that the motion deals with that sort of issue.

I think they're talking about vouching for -- or expressing opinion as to a person's guilt or innocence.

Is that correct, Mr. Williams?

MR. WILLIAMS: Yes, Your Honor. If I'm not mistaken, I thought I heard the prosecutor for the government call my client a criminal in her opening statement, so -- but, yes, that's my concern.

THE COURT: Thank you.

MS. WOOLRIDGE: And I will -- and I will point -- because we did not address those. I was very careful -- and I would not call someone a criminal. I said he was a convicted felon because that is, in fact, necessary to one of the elements of the crime.

THE COURT: Thank you.

So I am going to grant the motion in limine regarding the vouching of -- or expressing a person's -- if it's improper at any point, then you can certainly raise your objection, but I don't -- I haven't seen anything to that effect, and I don't think that that would be -- will become an issue.

So I guess it's standard, and I'm sure Ms. Woolridge does not object to that.

There's the motion in limine to prevent reading the indictment.

I did not read the indictment. That's not my practice. I usually read the elements and try to just talk about the allegations. So that motion will be granted.

Is there any objection to that, Ms. Woolridge?

MS. WOOLRIDGE:  No, Your Honor.  No objection to just not reading the indictment, but I would note that pretty much all of the information in the indictment is going to come through as the course of the jury instructions.

THE COURT:  Sure.  But I just don't go through and read the indictment per se.  We do it through the elements of the jury instructions.

MS. WOOLRIDGE:  Right, right.  And that's -- and that's perfectly fine.

THE COURT:  Thank you.

MR. WILLIAMS:  And, Your Honor, just on that point.  The indictment won't be given to the jurors to take back --

THE COURT:  We don't give the -- I don't let the jurors take the indictment back.

MR. WILLIAMS:  Thanks.

THE COURT:  Any objection to that?

MS. WOOLRIDGE:  No, Your Honor.

THE COURT:  Thank you.

So that motion will be granted.

There is a motion in limine to preclude the government from introducing statements of its witnesses that contain hearsay.

Certainly, if there is any objection -- if there is anything that -- any exhibits or documents or testimony that would call for hearsay, it certainly would not be admissible under the rules, and I'll expect Mr. Williams to object when

appropriate.

So I think I'm -- I am going to deny this motion in limine as moot so that you can make your objections as we go along.

MR. WILLIAMS:  Thank you, Your Honor.

THE COURT:  Thank you.

And there is a notice of objections to the government's notice.  I went through the docket and saw that there were notices given originally.  There was no issue as to any disclosure or lack of disclosure of any confessions or statements or admissions.

Mr. Williams, was there something in particular that you suspect Ms. Woolridge is going to introduce that you haven't seen or anything to that effect?

MR. WILLIAMS:  I don't think so, Your Honor.  My concern was I was hoping to get more specificity about what the government was calling a confession or an admission, but I think if -- I've noted that the government sent in a reply, and it identified specific pages and things of that sort, so I think I'm fine now that the government has responded specifying which pages in the disclosure it's referring to.

THE COURT:  Thank you.

So the notice of objections will be denied as moot.

MR. WILLIAMS:  Thank you.

THE COURT:  And I did read the government's response to that notice.

And the government's motion in limine to preclude defendant's self-serving hearsay statements will be granted.

Was there anything you wanted to say, Mr. Williams, as to that motion?

MR. WILLIAMS: No, Your Honor. I understand it. No objections.

THE COURT: Thank you.

And the motion in limine to preclude defenses, I don't believe that there have been any notices of particular defenses that have been filed.

Would you like to be heard, Mr. Williams?

MR. WILLIAMS: Your Honor, you are correct, and, no, I don't need to be heard.

THE COURT: Thank you.

Anything you wanted to add, Ms. Woolridge?

MS. WOOLRIDGE: Your Honor, not -- not in addition to what we already discussed at sidebar, which -- with regard to what I believe were inappropriate statements by the defense.

THE COURT: So the motion in limine to preclude defenses is granted without objection.

Any other motions that we need to handle, or anything else that's outstanding?

MR. WILLIAMS: Well, I -- Your Honor, if I may.

THE COURT: Yes.

MR. WILLIAMS: I'm going to talk to my client, when we

get to the point, whether he's going to testify or not, but the government has given notice that it wants to use the previous felony conviction that my client has, and also a misdemeanor matter from Nogales City Court.

I've looked at the rule, 609, and I'd like to argue an opposition this information not come in, but I don't know if now would be the appropriate time, since we don't know if my client is going to testify or not.

THE COURT: Well, so let's handle the felony first. Is there a stipulation that we can read regarding the felony conviction that -- is that something that the parties have worked out, Ms. Woolridge? Or Mr. Williams?

MS. WOOLRIDGE: No, Your Honor. I have attempted to with the defense, but I have not received any response to many of my e-mails.

THE COURT: Mr. Williams?

MR. WILLIAMS: Your Honor, Ms. Woolridge and I, we communicate a lot, and I don't recall her specific communications regarding that issue.

But Rule 609 says: Specifically the following rules apply to attacking the witness's character for truthfulness --

THE COURT: I don't think -- let me back up.

I think they -- the felony would come in if -- because he is a prohibited possessor, and so that would go to motive as to why he would provide a false statement.

So rather than -- so it's not for impeachment, and I don't want the government going into the details of that felony conviction, so I am going to -- before we waste any more time, why don't the two of you discuss a stipulation that we could read to the jury just indicating that he does have a felony conviction.

Is there any objection to that?

MR. WILLIAMS: Well, Your Honor, I was just looking at the rule. The government gave notice that it was being used for impeachment purposes. And if you look at their notice they specifically cite Rule 609(a) -- (a), I think it's (1)(B) and (a)(2). So they said they're going to use it for impeachment purposes.

THE COURT: Well, certainly if he testifies and -- it would come in for impeachment purposes. If he doesn't testify in their case-in-chief, then I would allow it to come in as -- for the reasons I have stated.

The misdemeanor, is it a misdemeanor involving fraud or anything that would come in?

MS. WOOLRIDGE: Correct, Your Honor. It's three counts of fictitious plates. So it is false statement -- statement of moral turpitude with regard to providing false information.

MR. WILLIAMS: Your Honor, if I may. I mean, going on to that issue, I was going to argue against the felony because

it says that it must be admitted in a criminal case in which he is a witness -- if the witness is a defendant if the probative value of the evidence outweighs its prejudicial effect to that defendant.

So we would argue the prejudicial effects outweigh the probative value. I was going to make an argument about that, but maybe it's not the appropriate time.

But with respect to the misdemeanors, Your Honor. The government has not disclosed any conviction or record of conviction with respect to like a judgment, if I'm not mistaken. I'm sure the prosecutor will correct me.

If you look at the statute my client was apparently allegedly convicted of, it was -- and it's not at all clear that it could be used in this case.

It says: A person is guilty of a class 2 misdemeanor who displays or possesses a registration card or license plate knowing it to be fictitious or to have been stolen, canceled, revoked, suspended or altered.

So there's no false statement. And in fact, I think if you actually can find the factual basis of this matter, there was no statements made. I believe it was simply he had a license plate in his possession that was, I guess, canceled. I'm not even sure, but...

THE COURT: Well, I don't -- it's very difficult for me to make a decision if I don't know what the conviction is.

So let me hold -- let me take this under advisement.

I will ask the government to provide the documentation that it plans to use if it's going to be used for impeachment purposes, what documentation, Ms. Woolridge, you have regarding that conviction.

As for the felony, I am going to -- I'll ask the parties to provide a stipulation in the event -- to provide a stipulation as to the felony conviction.

I do think it is probative as to motive, so -- but I do think it's prejudicial if you discuss what the felony is. So for that reason, I am inclined to allow the government to use the felony conviction to show motive and intent, but I need to -- but I'm -- but not allow the government to go into the type of felony.

So I think I'll ask you to meet with the government so that you can come up with a stipulation that might -- that you could use -- that we could read to the jury.

MR. WILLIAMS: Your Honor, I thought what you just said was very appropriate and articulate, so I suggest we use that.

THE COURT: Okay. Thank you.

MR. WILLIAMS: And then, Your Honor, on that misdemeanor, if I could just point out, Rule 609(a)(2) says that -- it says: For any crime, regardless of the punishment, the evidence must be admitted if the Court can readily

determine that establishing the elements of the crime required proving or the witness's admitting a dishonest act or false statement.

I think the government is going to fail there, because when you look at the elements of the charge which he was convicted of, it doesn't -- it's not appropriate to use it.

THE COURT: Thank you.

Well, I'll take a look at the conviction and the statute, and go from there.

I think if you wait a few minutes, my law clerk will get a copy of the jury instructions to you so can you take them home and -- oh, you have them.

Great. Perfect. Then you can take a look at them, and we can deal with them tomorrow at some point.

MR. WILLIAMS: Thank you.

THE COURT: If there is nothing further, you are excused. Thank you.

(Off the record at 4:42 p.m.)

C E R T I F I C A T E

I, Andrea Tracy Jamieson, was duly authorized to be present at and stenographically report the hearing from which the foregoing transcript was prepared.  Further, I hereby certify that the foregoing pages constitute a full, true and accurate transcript of the proceedings contained herein, held in the above-entitled cause on the date specified therein.

Signed in Tucson, Arizona, on June 2, 2023.

/s/ A. Tracy Jamieson
A. Tracy Jamieson, RDR, CRR

UNITED STATES DISTRICT COURT